UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
SEGUNDO MELCHOR VALLES RUBIO,

      *Petitioner*,

    -against-

OLGA KATERINE VEINTIMILLA CASTRO,

      *Respondent*.

--------------------------------X

**MEMORANDUM & ORDER**

19-CV-2524(KAM)(ST)

**MATSUMOTO, United States District Judge:**

Petitioner Segundo Melchor Valles Rubio ("Valles" or
"petitioner"), a citizen of Ecuador, petitions this court for
the return of his son to Ecuador pursuant to the Hague
Convention on the Civil Aspects of International Child
Abduction, art. 2, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343
U.N.T.S. 89, reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986)
("Hague Convention" or "Convention"), as implemented by the
International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–
11610 ("ICARA"). The child, B.V.,[1] age 9, has been retained in
the United States by his mother, respondent Olga Katerine
Veintimilla Castro ("Veintimilla" or "respondent"), also a
citizen of Ecuador, without petitioner's consent since May 2,
2018.

---
[1] The child's initials, instead of his full name, are used to protect his
identity pursuant to Federal Rule of Civil Procedure 5.2.

Petitioner commenced this action on April 30, 2019.
On June 3, 4, and 5, 2019, the court held an evidentiary
hearing. Petitioner, respondent, Ariel Gould, Esq., an
immigration attorney retained by respondent, and Dr. Edward
Fernandez, Psy.D., a clinical psychologist also retained by
respondent as an expert witness, testified in open court. At
the beginning of the hearing, the court interviewed the child,
asking questions submitted by the parties, *in camera* in the
presence of counsel, and on the record with the assistance of a
Spanish interpreter, but outside the presence of the parties.
(*See generally* H'rg Tr. ("Tr.").) The court received into
evidence a number of exhibits including certified translations
of legal documents from the parties' prior litigations in
Ecuador. (*See, e.g.*, ECF No 24, Resp't's Ltr.; Exs. AB, AC, AI,
AK-AM.) The parties then submitted additional, stipulated
translations of documents, proposed findings of fact and
conclusions of law, (*see* ECF No. 25, Resp't's Prop. Findings of
Fact and Concl. of Law ("Resp. Prop."); ECF No. 26, Pet'r's
Prop. Findings of Fact and Concl. of Law ("Pet. Prop.")), and
then replied to each other's respective proposals, (*see* ECF No.
27, Resp't's Opp'n ("Resp. Opp."); ECF No. 28, Pet'r's Opp'n
("Pet. Opp.")). The parties also stipulated to a number of
facts, to which the court refers in this memorandum. (*See* Jt.
Stip. Facts ("Stip.").)

For the reasons set forth in this Memorandum and
Order, which constitutes the court's findings of fact and
conclusions of law pursuant to Rule 52 of the Federal Rules of
Civil Procedure, the petition is GRANTED.

**FINDINGS OF FACT**

I.     **Chronology of Events**

Petitioner Valles and respondent Veintimilla began an
intimate relationship in 2005 in Ecuador. (Stip. ¶ 1.) Though
the two have never been married, they lived together in Machala,
Ecuador from 2005 until 2010. (*Id.* ¶¶ 2-3.) Petitioner told
respondent he did not want to have children with her and when
she became pregnant, the petitioner yelled at her and told her
that he was not the father. (Tr. 169.) This relationship bore
one child, B.V., in April 2010, who is the subject of this
petition. (Stip. ¶¶ 4-5.) Respondent testified that their
relationship was "conflict-ridden" and that petitioner shouted
insults at her, calling her derogatory names like "elephant" and
"whore" in the presence of B.V. (Tr. 166.) Sometime in fall of
2011, respondent moved to Duran, Ecuador with the child, and
without petitioner, where they shared a home with her brother.
(Stip. ¶ 6; Tr. 224:1-4.) Petitioner maintains an apartment in
Guayaquil, Ecuador. (Tr. 80:7-18.) Though petitioner and
respondent do not have a formal custody arrangement, the child

spent time with his father on weekends and holidays.[2] (Tr. 52:16-24; 79:9-80:1; 130:12-17; 155:15-19.) Respondent testified that her son would return from visits with his father, and that his behavior changed to the extent that B.V. began insulting her and his classmates, noting that respondent would cry when his father insulted her. (Tr. 167.) When B.V. was 3-1/2 or 4 years old, respondent went with B.V. to petitioner's business to seek $30 per month that he had offered to pay for child support, but petitioner called her a whore and pushed her out of the warehouse. In February 2015, respondent petitioned an Ecuadorian Family Court to have petitioner pay child support for the child, (Stip. ¶ 13-14), and the Court ordered that petitioner pay $103 per month in child support, (Tr. 176-78). Respondent also rented her home in Duran to earn money to support herself and B.V. and received financial assistance from her grandmother and an aunt in the United States. (Tr. 169-70.)

Petitioner, who has five adult children from a previous relationship, owns a gun shop and warehouse in Ecuador and is a firearms and accessories dealer. (Stip. ¶ 57.) He has occasionally in the past traveled to the United States. (*Id.* ¶

---

[2] There is some dispute as to how frequently petitioner would see B.V., particularly between 2015 and 2016, though it is undisputed that petitioner resumed his visits with the child by mid-2016. (*See* Tr. 182:9-17.) Petitioner testified that between December 2015 through March 2016, he did not see his son. (Tr. 156-57.) Respondent testified that petitioner stopped seeing B.V. in 2015 and did not see him again until mid-2016. (Tr. 182.)

59.)  Before B.V. was born, respondent worked at petitioner's gun warehouse without pay.  (Tr. 170.)  Both respondent and B.V. credibly testified that they observed petitioner transport weapons in a hidden compartment in his truck, which prompted respondent to speak with petitioner about the danger of transporting weapons with their child in the vehicle. Petitioner responded that she should not get involved.  (*See, e.g.*, Ex. W, Photo; Tr. 22, 183-88.)  Petitioner also testified that he carried an unloaded firearm locked in a case in the backseat of his truck.  (Tr. 115-16.)

Shortly after respondent sought child support in February 2015, petitioner brought a legal action against respondent in Ecuadorian Family Court in July 2015, alleging that respondent physically abused the child.  (Stip. ¶ 15.) Though the Family Court found respondent innocent in a decision dated August 20, 2015, based on a statement by B.V.'s schoolteacher that B.V. had been hurt in an accident at school, (*id.* ¶ 16), it also ordered "all the victims" and the aggressor to appear for therapy, though the parties dispute that the Family Court intended petitioner to participate in therapy.[3]

---

[3]     Exhibit AI is an Ecuadorian social worker's report dated July 27, 2015 which Dr. Fernandez reviewed, and which recounts an interview of petitioner, respondent, and B.V.  The report appears to have been adopted into Exhibit AK, the August 20, 2015, decision of the Ecuadorian Family Court.  (Ex. AK, Aug. 20, 2015 Op. 4.)  In the English translation, to which the parties stipulated and which the court admitted into evidence, the social worker and

(*See* Resp. Prop. ¶ 146; Pet. Opp. 12; Resp. Opp. 12; *see also*
Ex. AK, Aug. 20, 2015 Op.; Ex. AM, Psych. Eval.)  A
psychological evaluation[4], (Ex. AM, Psych. Eval.), by the Center
for the Integrated Protection and Attention of Interfamily and
Gender Violence, of the Ministry of Justice, notes that
attendance at psychological therapy for petitioner, respondent,
and B.V. was requested, as well as quarterly reports.  (Psych.
Eval. 1.)  Respondent offered a visitor log indicating that she
attended court-ordered therapy sessions, but that petitioner did
not attend these sessions.  (Ex. AB, Visitor Log; Ex. AI, Soc.
Worker Rept. 4.)  Based on these documents, however, the court
cannot conclude that petitioner failed to attend court-ordered
therapy sessions between September 21 and March 18, 2016, as it
is unclear that petitioner was ordered to attend therapy at the
times listed in the visitor's log.  The absence of petitioner's
signature on the visitor-log does not necessarily mean he was
required to attend.  Indeed, the only notation aside from

_____

the Family court recommended that "psychological and family therapy be
provided to all the victims as well as the aggressor in order to try to
restore the family nucleus and prevent revictimization of the individual."
(*Id.*; Ex. AI, Soc. Worker Rept. 4.)  It is not clear from this recommendation
who the victims and aggressor are, nor is it clear that petitioner was
ordered to therapy.  Thus, it is not clear that his alleged failure to
participate in family therapy constitutes a failure to comply. (*See* Resp.
Prop. 24, ¶ 146.)  However, Exhibit AM appears to be a mental health
professional's report of a therapy session that included interviews of
respondent, petitioner, and B.V., which notes that the three "attend[ed]
therapy at the request of the [Family Court]."  (Ex. AM, Psych. Eval. 1.)
The report, however, concludes that therapy would continue "for the child
together with his mother" without reference to petitioner.  (*Id.*)
[4]     The document refers to a September 7, 2015, communication from the
Ecuadorian Family Court, but the document is otherwise undated.

respondent's signature on the log is vague and illegible and
does not indicate petitioner was absent.

The Provincial Court of Justice in Gayas, Ecuador,
confirmed the Family Court's August 20, 2015, decision finding
respondent innocent of child abuse, after petitioner appealed.
(*Id.* ¶ 17.) Sometime in 2016, petitioner unsuccessfully sought
a court order to have his child support obligations reduced,
claiming he had another son to support, but the other son was an
adult. (*Id.* ¶¶ 18-19; Tr. 178-79.)

In 2014, respondent obtained a tourist visa to the
United States for herself and B.V. (*Id.* ¶ 20.) The parties do
not dispute that under Ecuador's parental custodial laws, both
biological parents must consent to their child's international
travel. (Pet. Prop. 17-18; *see also* ECF No. 1, Ver. Pet. ¶ 26
(citing Ecuadorian Code of Childhood and Adolescence art. 109).)
Petitioner had agreed to authorize B.V.'s travel with
respondent, however, after respondent purchased their tickets,
petitioner refused to authorize the child's travel. (Stip. ¶
21; Tr. 211-12.) Respondent decided to travel to the United
States without child, and asked to leave B.V. with petitioner.
Petitioner, however, grew angry when respondent informed him
that she would be traveling for nearly a month, stating that he
was not a babysitter, and that he would not take care of or be
responsible for "that shitty child." (Tr. 211-12.) Respondent

instead left the child with her family, the child's aunt and uncle, in Ecuador while she visited the United States for two months. (Stip. ¶¶ 23-24.)

In 2016, Veintimilla sought to travel to the United States with B.V. (*Id.* ¶ 26.) Petitioner again refused to grant permission, and respondent sought court authorization to travel with B.V. to the United States. (*Id.* ¶¶ 27-28.) The Ecuadorian Family court authorized the travel and respondent and B.V. traveled to the United States and stayed with respondent's Aunt Leonor in Elmont, New York. (*Id.* ¶¶ 29-31.) Respondent and the child eventually returned to Ecuador in 2016. (*Id.* ¶ 32.)

In 2018, respondent once again sought to travel to the United States with B.V. (*Id.* ¶ 33.) Petitioner once again refused to authorize B.V. to travel. (*Id.* ¶ 34.) Respondent sought and obtained court authorization to travel with the child and return to Ecuador by May 2, 2018. (Ex. 9, Ecuador Family Ct. Travel Auth. ¶¶ 3-6.[5]) Respondent and B.V. eventually traveled to the United States on April 1, 2018. (*Id.* ¶¶ 35, 37.) Respondent and B.V. stayed with respondent's Aunt Leonor in Jackson Heights, Queens, and with B.V.'s two cousins. (*Id.* ¶¶ 40-41.) When respondent arrived in New York, she learned

---

[5]    As the parties are native Spanish speakers and citizens of Ecuador, many of the documents provided as exhibits in this matter are originally in Spanish. Such exhibits are provided with certified and stipulated translations.

that her aunt had lost her home in Elmont and had relocated to Jackson Heights. (Tr. 215.)

Though respondent and B.V. were required by Ecuadorian Family Court order to return to Ecuador by May 2, 2018, they have not returned to Ecuador since leaving on April 1, 2018. (*Id.* ¶ 42.) Moreover, the two have apparently overstayed their visas, but neither are the subject of removal proceedings. (Resp. Prop. ¶ 108; Stip. ¶ 61; Tr. 58:15-17; 59:17-21; 63:4-8; 72:4-7.)

**PROCEDURAL HISTORY**

**I. The Petition**

Petitioner filed the instant action on April 30, 2019, "to secure the return of his nine-year-old son, [B.V.]," and an award of "all costs and fees incurred" as necessary expenses as a result of Respondent's alleged wrongful retention of B.V. (*Id.* ¶ 56; ECF No. 1, Ver. Pet. ¶¶ 1, 65-66.) Petitioner concurrently moved for an injunction restraining respondent's ability to leave the District, an order that Respondent surrender her and the child's passport to the Clerk of Court for the District, and an order that respondent appear for a show cause hearing. (Ver. Pet. ¶ 67.)

On the same day, April 30, 2019, in keeping with its statutory obligation to expedite petitions brought under the Hague Convention, the court ordered respondent to show cause at

a hearing on May 10, 2019, why the child should not be returned to Ecuador. (ECF No. 5, Order to Show Cause.)  The court also prohibited respondent from removing or arranging for the removal of the child from the District and ordered that respondent surrender her passport and the child's to the Clerk of Court. (*Id.*)  Petitioner filed an affidavit of service on May 1, 2019, (ECF No. 6, Aff. Service), and respondent surrendered two passports to the Clerk of Court on May 3, 2019, (*see* Docket Entry dated May 3, 2019).

Counsel for respondent appeared on May 8, 2019, (ECF No. 7, Not. Appearance), and the court invited respondent to file an answer to the petition before the May 10, 2019, hearing, (*see* Docket Order dated May 8, 2019).  Respondent filed a declaration on May 9, 2019, responding to the petition.  (ECF No. 8, Decl.)  At the May 10, 2019, hearing, both parties and the child were present.  The court scheduled additional hearing days, ordered briefing by the parties, and encouraged the parties to confer towards settlement and to arrange for petitioner to visit his son whom he had not seen in over a year.

II.    **Hearing**

The show cause hearing spanned several days, and the court heard testimony from the child, the parties, an immigration attorney, and a clinical psychologist retained by

respondent, on June 3, June 4, and June 5, 2019.[6] (*See* Minute Entries dated June 3-5, 2019.)

### A.   **Witness Testimony**

#### 1.   Interview of Child

The court began the hearing by interviewing the child, who was placed under oath, outside the presence of either party, but in the presence of counsel and an interpreter. (Tr. 17.) The court finds that the child understood the meaning of the oath and the obligation to tell the truth. The court also finds that the child's testimony was credible, except where noted. The child testified that he was nine years old, that he was then in the third grade, and that he mostly liked school. (Tr. 19-20.) He recalled living in Ecuador and visiting his father, though he lived with his mother. (Tr. 20.) He saw his father about once a week, but also testified that there were some weeks in which he did not see his father "because I didn't want to see him." (Tr. 20:14-20.) The child did not want to see his father on those occasions "because he w[ould] call me names" and "w[ould] hit me with a belt. And then he w[ould] leave [me] with my sister, who would lock me up inside the house." (Tr. 20:24-21:4.) The child testified that his father would sometimes call him "queer" or "fag" but that he also sometimes used those words

---

[6]     The parties arranged for the assistance of court certified interpreters at the show cause hearing.

referring to other people. (Tr. 22:11-14.) Petitioner also called the child "shit" once. (Tr. 21:19-21.) The child testified petitioner often insulted him "on occasions when [petitioner] would receive some bad news about me," often related to poor behavior in school like B.V.'s failure to do homework. (Tr. 21-22.) Such comments made the child feel bad and believe that his father hated him. (Tr. 22:18-19.)

The child recounted several instances of physical abuse by his father. During the child's testimony regarding physical abuse by his father, the child appeared to fidget, spinning in his chair away from the table, and asked when he could see his mother and finish his testimony. Consequently, the court curtailed its questioning of the child and was unable to pose many follow-up questions. B.V. first testified that his father hit him with a belt four times.[7] (Tr. 22-23.) He added

---

[7]     The child's testimony is unclear as to how many separate times he was hit with a belt. That is, whether petitioner hit the child with a belt on a single occasion, striking him four times, or whether petitioner hit the child with a belt on four separate occasions:
    The court: When he hit you on the bottom with a belt, how many times did he do that?
    A: The third time, once.
    Q: So he hit you four times total, and one time was with a belt on the butt; is that right?
    A: Yeah.
    Q: Okay, and how many times did he hit with you (sic) a belt besides that one time on the bottom?
    A: Once.
    Q: Okay, I think earlier you told me that he hit with a belt four times; is that right? Or did he hit you four times total, and one of those four times was with a belt?
    A: Yes.
    . . .

that his father hit him with a stick once, (Tr. 23:6-7), and that his father's ex-wife also hit him with a stick, (Tr. 25:24-25; 26:5-7). Concerning the times he was hit with a belt by his father, the child testified that his father hit him both while the child was wearing clothes and directly on his bare skin. (Tr. 24:4-22.) Though the child also testified that when petitioner hit him with a belt it left bumps or a red mark, including on his buttocks even though the child was wearing pants while he was struck by his father with a belt on the buttocks. (Tr. 24:10-22.) B.V. did not testify that his father hit him with his hands, but he did testify that he once observed his father hit *respondent* with his hands. (Tr. 23:17-21.) Witnessing his father hit his mother made the child feel bad. (Tr. 24:3.)

Petitioner also once tied B.V. up "while he was beating [him]." (Tr. 38:15-16.) The child had earlier gone "to the beach with [his] brother and [his] cousins," when his "father arrived and he . . . scolded [B.V.]" before they returned to Guayaquil, where his father lives. (Tr. 39:4-6.) Upon returning, B.V. was tired and fell asleep, and "didn't notice" and "didn't feel anything when [petitioner] tied [him]

---

Q:[B]ut how many times did your father hit [you] with the belt?
A: All of them, with all of those that I mentioned.
(Tr. 25:3-19.)

up and hit [him]." (Tr. 39:6-8.) B.V. was asleep in bed when his father tied his hands and feet with a belt, (Tr. 39:17-23), but he did not wake up because he "didn't feel anything" and was "deep asleep," (Tr. 39:24-40:4). His father "tied [him] up with two" long belts, then started to beat him with a third belt, but the child did not wake up, because he "just felt a little bit of pain but . . . said, 'nah, that's nothing.'" (Tr. 40:5-25; 41:1-9.) The child recalled that he "just felt a pinch." (Tr. 40:19.) Though this testimony appears to be the child's recollection of a dream, when asked if he was dreaming, he testified that it was not a dream. (Tr. 40:13.) The court finds that the child's account of being tied up and beaten while asleep in bed was most likely a dream.

B.V. also testified to being left alone by his older, adult half-sister, Pocha. (Tr. 26.) He testified that it happened once, but he could not recall how old he was at the time, either five, six, or seven years old.[8] (*Id.*) The child believed that his father was away in Guayaquil, and "as always, he was selling weapons." (Tr. 27:6-7.)

The child testified about his father's firearms. He stated, "[m]y father had a handgun. It was not a toy handgun.

---

[8]     Respondent, on the other hand, testified that B.V. was left alone by Pocha more than once and testified that B.V. told her he woke up in the middle of the night to find no one home—not Pocha, not her husband, and not her children. (Tr. 205:9-24.)

It was a real handgun. And he had it hidden or covered by a piece of cloth where the lever to starting the car is located." (Tr. 27:14-16.) He further testified that his father once handed him a loaded handgun, "not a toy handgun," while in his father's office in his weapons warehouse. (Tr. 27:14-24; Tr. 31:3-15.) B.V. apparently pulled the trigger, and "[a] bullet got out, because [B.V.] wanted to see if [it was] loaded." (Tr. 28:1-5.) B.V. stated that petitioner "was abusing me," and then told the child "[g]ive me the gun back, I have to see . . . if it fired by accident."[9] (Tr. 28:6-7.) A computer broke as a result of the gunshot, and petitioner told the child, "[g]ive me the gun, the pistol, otherwise-maybe I might fire at you."[10] (Tr. 29:5-8.) As to this last exchange, the child concluded "[s]o he was abusing me." (Tr. 29:7.) When asked how petitioner was abusing him, B.V. responded "[h]e was abusing me about giving me (sic) the gun." (Tr. 29:20.) According to B.V., his father "said that he might—he said he was going to fire at me by accident." (Tr. 30:1-18.) B.V. testified that he was scared. (Tr. 29:25-30:4.)

---

[9]     B.V. was inconsistent as to the timing of this exchange. He later testified that he pulled the trigger *after* his father demanded to see the gun and threatened to fire the gun at B.V. by accident. (Tr. 30:16-22.)
[10]    The transcript of this testimony by the child, given originally in Spanish by the child and translated into English by an interpreter, is somewhat unclear. That is, interpreter Daniel Sherr, then sitting in reserve while another interpreter translated for the child, interjected during the child's testimony to clarify what Sherr believed was an omission by the other interpreter. (*See* Tr. 28-29.) The court permitted the child a brief break while it sought clarification from the interpreters. (Tr. 29:3-9.)

B.V. also testified about the presence of guns in his father's home, though somewhat inconsistently. When asked if he had "seen weapons in [his] father's home," B.V. responded, "[y]es, I've heard shooting . . . [a]nd my father wasn't there." (Tr. 31:19-22.) The child testified that the shooting was outside his father's home and that it startled him. (Tr. 32:2.) Though the incident involving B.V.'s discharge of the handgun occurred at petitioner's office within his warehouse, the child testified that there are "some weapons in the closet" at his father's home. (Tr. 31.) B.V. saw five guns within his father's home: "one he has in the closet and others he has in a place where nobody can go in," though the child testified that both he and his father were able to access the guns. (Tr. 32:11-13.) When asked where this place was that only he could go, B.V. testified that it was "in [his] father's office, there's . . . a transparent door," beyond which is a hammock where the child sometimes sleeps and a door with a shelf.[11] (Tr. 33:1-5.) The child asked his father what was there, and petitioner responded, "[t]hese are guns that I'm going to sell." (Tr. 33:5-6.) B.V. also testified that the closet in which he

_____

[11]    B.V. also testified, "[a]nd that's where the bathroom was," but stated that guns were not hidden in the bathroom. (Tr. 32:17-20.) As part of this testimony, B.V. also initially testified, in English, that his father was in the bedroom on one occasion when B.V. found these guns and accessories, but the interpreter later clarified B.V. was referring to his father being in the bathroom when B.V. discovered the weapons in his father's bedroom. (Tr. 35.)

saw guns on a shelf is in his father's bedroom, where his father sleeps, and that his father "had a gun underneath" his bed. (Tr. 35.) Another time when B.V. was looking at this collection of guns and accessories, outside his father's presence, he recognized what he believed was a silencer on the shelf in his father's bedroom closet, *see* 18 U.S.C. § 921(a)(24), having seen something similar in a videogame called Fortnight. (Tr. 34-35.) B.V. also recognized a shotgun, other "[l]ong guns," and what he described as a "silencer[] that you like look through," which the court clarified was a scope. (Tr. 36:2-18.) The child once again testified that there were five guns in all that he observed within his father's home. (Tr. 36:9.)

B.V. also recounted the sale and transportation of guns by his father while B.V. was a passenger in his father's truck. He testified that petitioner traveled with a handgun hidden in his truck. (Tr. 25; 37.) Petitioner "had a handgun . . . not a toy handgun . . . hidden or covered by a piece of cloth" near the car's ignition. (Tr. 25:14-16; 37:2-4.) When asked if he had seen other guns in his father's truck the child responded in English, "Yeah. No. No." (Tr. 37:8-9.) When asked if he observed his father "[sell] guns out of his car," B.V. responded "[n]o. Yes, yes, yes" to the court's question. (Tr. 37:12.) He did recall, however, one instance where he saw his father exchange or sell a gun with a fat man at his father's

house.  (Tr. 37:14-22.)  B.V. was with one of his best friends when his father told the two to go outside.  (*Id.*)  After leaving, while on the roof or a balcony of his friend's house, the child saw his father disassemble and re-assemble a gun because, B.V. believed, "it needed a missing part."  (Tr. 37-38.)  When the fat man apparently saw the children watching them, "he came after [B.V.]," but B.V. "went back into the house and shut the door."  (Tr. 38:12-14.)

Reflecting on time spent with his father, B.V. testified that he did not have any good times, stating that his "relationship with [his] father was good until he hit me.  And at that point, from that point on, the relationship became bad." (Tr. 41:10-15.)  The child does not want to return to Ecuador, because he hates his half-brothers and his father.  (Tr. 44:2-8.)  He testified that his brothers "mistreat" him and keep him locked in the house and make B.V. do everything for them.  (Tr. 44:11-15.)  B.V. testified that he hates his father "because he beats me. He leaves me alone. He also hates me."  (Tr. 44:24-45:1.)  B.V. believes his father hates him because he mistreats him.  (Tr. 45:3-4.)  At this point in the testimony, the child repeated three times "he hates me," and explained that he (B.V.) felt angered.  (Tr. 45:3-8.)  When shown a photograph of himself, his father, his half-sister, Pocha, and others eating a

meal, (Ex. 5, Photo), B.V. crossed out his father's and Pocha's faces, saying "I hate this" and "I don't like it." (Tr. 45-46.)

As to his half-sister, Pocha, B.V. does not like her because he believes she also hates him, but sometimes "she was good because sometimes we played together." (Tr. 46:12-16.) Though B.V. testified that Pocha did not do anything to make him feel badly, he also testified that she left him alone when he was little once. (Tr. 46:17-22.) During the interview, B.V was shown an essay he wrote in Spanish at school in New York. (Tr. 49-50 (citing Ex. O, Essay).) He confirmed that everything he wrote was true, including that his sister Pocha left him "locked in," and that he used the derogatory term—"perra"—to describe Pocha. He added that "perra" is a "bad word" and that he erased it. (Tr. 49:19-50:8.)

B.V. enjoys school and living in New York. He testified that it was good to live in New York because "there was a lot of trash in Ecuador. And there are a lot of accidents because on occasion the traffic lights don't work." (Tr. 46:25-47:4.) The child testified that his "mother's family [wa]s good" and his father's family in Ecuador was bad. (Tr. 47:8-10.) He would feel badly about living in Ecuador and was "a little nervous" at the prospect. (Tr. 47:11-13.) B.V. explained that he did not want his friends in Ecuador to see him because he thought they "forgot about [him]." (Tr. 47:14-20.)

He also felt nervous about seeing his father's family again because he feared they would not remember him. (Tr. 47:21-25.)

B.V. testified that he wanted to stay in New York because he thought it was good here and there were no trash and no accidents. (*Id.*) B.V. testified that he preferred to be in New York with his mother and did not want to live with his father in Ecuador because his father "mistreats [him] and abuses [him]." (Tr. 49:1-11.) However, the child was then shown Exhibit 4, a picture of B.V. and petitioner, and asked if he had a good time when he was with his father. (Tr. 52:16.) B.V. initially answered that he did not know, and when pressed, responded "[y]es" in English. (Tr. 52:17-24.) B.V. stated, "perhaps the problem is that when my father takes me somewhere, he always takes photos of me. And I don't like that." (Tr. 12.) The child testified that, during arranged visits with his father around the time of the court's initial May 10, 2019 hearing in this case, petitioner yelled at the child when he spoke English to him. (Tr. 53-54.) B.V. also stated that he did not want to visit with his father during his trip to New York for the hearing, and that his father whispered in B.V.'s ear that he was going to take B.V. to Ecuador, and B.V. told his father that he did not want him to take him to Ecuador. (Tr. 43:8-21.) Finally, B.V. acknowledged that he met with Dr. Eduardo Fernandez, a psychologist retained by his mother in the

instant proceeding, though B.V. testified that "[his] father asked for a psychologist." (Tr. 43:2.) B.V. stated that his mother did not tell him what to say to Dr. Fernandez, that "I myself told myself," and that B.V. told him the truth. (Tr. 42:23-43:7.)

Based on the child's foregoing testimony, the court finds that B.V. credibly testified that he has suffered physical abuse by petitioner with a belt on four occasions, though one instance was likely a dream, and with a stick on one occasion, and verbal abuse by his father on multiple occasions, and has additionally witnessed his father strike his mother on one occasion. The court further finds that the child, who was nine years old at the time of the hearing and in the third grade, expressed a strong desire not to return to Ecuador or see his father because of the abuse which has led to his belief that his father hates him and the child's expression of hatred of, and anger toward, his father. (Tr. 44-45.)

2. <u>Petitioner's Testimony</u>

Petitioner testified to his general parental discipline practices, stating that he never disciplined B.V. for misbehaving, opting instead to speak to [his children] "at the same level, to talk to them." (Tr. 112:12-18.) He denied ever abusing B.V. or punishing him, or any other of his children.

(Tr. 112:17-18.)  He also denied tying up any of his children.
(Tr. 112:19-20.)

Petitioner admitted to "beating" B.V. once when he was
"very small," around two or three years old.  (Tr. 112:22-24;
113:21-24.)  He then qualified his answer by questioning if one
could "call that 'beating.'"  (Tr. 112:23.)  Recounting this
incident, petitioner testified that, in response to B.V.'s
refusal to eat "*choclo*," a corn dish, while at an uncle's house
in Ecuador, petitioner grabbed a "little piece of fabric," which
was used as a belt for a little girl's dress, and apparently
struck B.V. with it.  (Tr. 113-14.)  Petitioner explained that
"Uncle Pica" has young daughters who were small at the time, as
was B.V.  (Tr. 113:21-24.)  Though it is unclear where on the
child's body, or how many times, petitioner struck B.V., he
testified that he did not hurt B.V. and that B.V. did not cry.
(Tr. 114:14.)

Petitioner also denied keeping weapons at his home or
traveling with hidden weapons in his vehicle, though he stated
he complied with Ecuadorian laws which required weapons
transported by car be unloaded and secured separately from
ammunition in locked boxes.  (Tr. 115-16.)  Petitioner testified
that he complied with these laws and placed his firearm in his
travel bag in the back seat.  (*Id*.)  He explained that he could

not travel with a loaded gun because he would lose his license and the gun.  (Tr. 117:1-3.)

Petitioner denied leaving B.V. or any of his other children alone with a loaded weapon, citing the obvious risk that the child might pull the trigger.  (Tr. 115:1-8.) Petitioner admitted he had weapons at his office or place of work.  (Tr. 115.)  He testified that his office did not have a place where he could sleep, lie down, or take a nap.  (Tr. 116:14-21.)  Petitioner also denied having weapons at home, and specifically under his bed, explaining that his home was "a safe place," (Tr. 117:6-7), and admitted that traveling and working at his office were the potential dangers, (Tr. 116:24-25).

Valles also recounted that when traveling with B.V. who was asleep in his vehicle, B.V. awoke when the police were checking the vehicle.  Police found a "toy replica revolver . . . not a firing weapon" beneath B.V.'s car seat, that had been apparently left by petitioner's grandson Kenneth.  (Tr. 117-18.)  Petitioner stated that B.V. was about five years old at the time.  The police also found petitioner's weapon and ammunition in separate locked cases, checked petitioner's documentation, and let him go.  (Tr. 118.)

Petitioner also admitted to preparing photo albums to post on the Facebook account that he created for B.V.  (Tr. 119-20, 147-48.)  He also posted a photo to B.V.'s Facebook account

that he received from respondent, showing respondent and B.V. at a paintball venue, in which he circled respondent and B.V. in red. (Ex. 13, Photos.) Petitioner claimed that respondent was pointing her paintball gun at B.V.'s head in the photo. (Tr. 119-21.) Petitioner admitted that he created B.V.'s Facebook account, and has controlled and continues to control the account. Petitioner posted the photographs appearing on B.V.'s Facebook account. (Tr. 149.)

On cross-examination, petitioner was asked about his declaration denying that he was physically or psychologically abusive to respondent. (Tr. 122-23.) He conceded that "constantly insulting and belittling someone" was abuse, as were "throwing things," "calling someone stupid or no brain or animal," "calling someone faggot or shit," and calling a girlfriend "elephant or fat while she is pregnant." (Tr. 123-24.) Valles also admitted that not paying for an uninsured girlfriend's medical expenses related to her pregnancy and telling her to take a taxi to the hospital when her water breaks would also be abusive. (*Id*.) Petitioner agreed with respondent's counsel that refusing to assist in parental duties for a newborn would be abusive to both the mother and child as would refusing to pay for the child's needs. (Tr. 125:10-20.) He also admitted that refusing to pay child support was abusive, as is scolding the mother for begging for child support. (Tr.

125:21-126:3.)  Petitioner also agreed that demeaning a mother in from of the child, teaching a child to insult and scream at his mother, telling a son that his mother is a bad mother, ugly, fat, stupid, worthless or otherwise insulting the mother in front of the child were abusive behaviors.  (Tr. 127.)  Valles also conceded that "leaving a five- or six- or seven-year-old child alone overnight with only a glass of milk for food" would be abusive, (Tr. 127:19-21), as would allowing other family members to abuse a child, (Tr. 128:20-22).  He denied, however, that leaving a child alone with a gun or weapon was abusive, responding instead that it was irresponsible.  (Tr. 128:23-25.)

Valles denied ever leaving his son alone.  (Tr. 129.)  He admitted to leaving B.V. in the care of his daughter Pocha, however, including overnight for pajama parties with B.V.'s cousins when petitioner was not present.  (Tr. 129-30.)  Petitioner testified that Pocha never left B.V. by himself overnight or during the day, stating that she could have called petitioner to pick him up because the two live four blocks away from each other.  (Tr. 130:18-20.)  He added that "[t]he kid was absolutely horrified at the possibility of being alone."  (Tr. 130-131.)

Petitioner denied refusing to pay child support for B.V., though he acknowledged respondent had filed a complaint with the Ecuadorian Family Court regarding child support.  (Tr.

132-33.)  He testified the two had "always agreed" to share the cost of B.V.'s needs and education, but that after he assisted respondent with obtaining a visa from a United States consulate in Ecuador, she told him of her desire to live in the United States with B.V.  (Tr. 133.)  After petitioner refused to acquiesce to allowing B.V. to leave Ecuador with respondent for a trip to the United States, petitioner stated that respondent "blackmailed" him and told him "she was going to present a claim for child support" if he did not authorize her to leave Ecuador with B.V. (Ex. P, Visas; Stip. ¶ 13-14; Tr. 134.)  Prior to this dispute, petitioner testified that he and respondent shared the costs of B.V.'s needs as they arose.  That is, he paid for B.V.'s "nourishment and studies" and for his clothing and explained that B.V. apparently benefited from petitioner's social security payments and medical insurance.  (Tr. 133; 135-36.)

As a result of respondent's suit for child support, which petitioner opposed, the Ecuadorian Family Court ordered petitioner to pay a fixed monthly amount in child support.  (*See* Tr. 137, 138-39.)  Petitioner stated he did not receive proper notices from the Court, and appealed the child support ruling, but was not successful.  (Tr. 136:19-137:4.)  Petitioner did not mention in his opposition to respondent's request for child support that she had previously attempted to blackmail him.

26

(Ex. AC; Tr. 137:17-25; 139:10-21.)  Sometime in 2016, however,
Valles petitioned the Family Court to reduce his child support
obligations, claiming he had another child to support; the
request was denied by the court.  (Tr. 139:19-23.)

Earlier, in 2015, petitioner filed a complaint
alleging that respondent had abused B.V., though she was
ultimately found innocent by the Ecuadorian Family Court on
August 20, 2015.  (Tr. 139-40.)  Petitioner admitted that B.V.
had hurt himself in an accident at school and was not injured by
respondent.  (Tr. 142.)  Petitioner denied, however, that the
court also found that he had influenced B.V.'s testimony to
state that his mother had hit him.  (*Id.*; Ex. AK, Aug. 20, 2015
Op. 3.)  The Ecuadorian Family Court's August 20, 2015 decision
noted that petitioner's repeated questioning of B.V. whether his
mother had beaten him had induced B.V. to answer in the
affirmative, and that petitioner as an adult, influenced B.V.'s
response when B.V. was five years old.  (Tr. 145-46.)
Petitioner appealed the family court decision, and was aware
that if his allegation of child abuse by respondent against B.V.
was upheld, she could be put in jail.  (Tr. 147.)  Petitioner
acknowledged that respondent was "saved from jail because of the
report prepared by the teacher," which stated that B.V. "was
injured by hitting a chair."  (Tr. 140; *see also* Stip. ¶¶ 15-17;
Ex. AK, Aug. 20, 2015 Op. 3.)

Petitioner denied that he yelled at B.V. during their visits in New York around the time of the hearing. He also denied that he was upset that B.V. was speaking English and testified that he was happy to hear him do so. (Tr. 150-51.) Petitioner further stated that if B.V. is returned to Ecuador and his mother, respondent, remains in New York, "we will continue to have the same life that my son had before, I will get him back into the same school, the FAE [military school], and I will take care of him as I always have taken care of him." (Tr. 154.) Petitioner referenced the photos of B.V. in Ecuador, that he claimed showed no mistreatment, that B.V. was well dressed, enjoying his extended paternal family in Pasaje, Ecuador, and friends in Guayaquil. He stated that "a picture says more than a thousand words." (Tr. 153-54.)

Petitioner stated that he bought B.V. a cell phone when he was six years old and that he learned to write and text. B.V. has the phone numbers of petitioner's relatives programmed in the phone, but petitioner was not aware if B.V. texted his sister Pocha. (Tr. 157-59.)

3. Respondent's Testimony

Respondent testified to the early stages of her relationship with petitioner which started in 2005 and lasted six years. (Tr. 165-66.) Petitioner, who had five adult children, told respondent he did not want to have a child with

her.  When respondent became pregnant with B.V., petitioner was indifferent, would yell at her, and told her their unborn child was not his.  (Tr. 168-69.)  Petitioner would also call respondent "whale" and "elephant," and said that the child she was carrying was the son of a whore.  (Tr. 170-71.)  She also testified that she covered her own medical expenses during that time, with some assistance from her aunt in New York, her grandmother, and rental income from respondent's home in Duran.  (Tr. 170.)  Petitioner would not even provide her food during her pregnancy, stating that she had no reason to eat.  (Tr. 169:9-15; 169:23-170:4.)  Respondent testified that, after B.V. was born, Valles would "towards us . . . always shout with insults," that "he was always offending us," all in the presence of B.V.  (Tr. 166:9-16.)  While the petitioner and respondent resided together, petitioner would not let respondent see her friends or family.  {Tr. 167.)

When respondent's water broke and she went into labor in the middle of the night, petitioner at first told her to take a cab to the hospital, but eventually dropped her off outside the hospital and never visited her, despite calls from the doctors.  (Tr. 171-72.)  She returned home after B.V. was born, driven by the couple's maid, and found petitioner once again indifferent.  (Tr. 172:22-25.)  Respondent testified that petitioner refused to pick up B.V. and would get upset when B.V.

cried, yelling at respondent to "make that piece of shit shut up
or be quiet." (Tr. 173.) Valles did not purchase clothes,
diapers, or other necessities for newborn B.V. for the first
year, though he offered to pay respondent up to $30 per month.
(Tr. 174.)

During the time petitioner, respondent, and B.V. lived
together, "the relationship was conflict ridden." (Tr. 166:9.)
Petitioner would constantly offend respondent by calling her
stupid, an elephant, saying she was fat, and telling her to
"shut up, don't remind me of what you are, a whore."
Petitioner's shouting and insults occurred in the presence of
B.V. (Tr. 166.) Eventually, respondent left petitioner and
moved with B.V. to Duran when B.V. was about one year and five
months old. (Tr. 174.) Petitioner said it was fine for her to
leave, not to expect to get anything from him, and to "take that
piece of shit" with her because petitioner "was not going to go
looking for him." (Tr. 174-75.) It was difficult for
respondent to make a living on her own to support herself and
the child, so she sought help from her family and from
petitioner. (Tr. 176.) She would occasionally visit Valles at
his warehouse to ask for money for the child, noting that
petitioner was not always timely with his promised payments and
would sometimes miss payments entirely. (Tr. 176:5-15.)
Respondent would bring B.V., then three or four years old, (Tr.

177:14-15), with her to the warehouse, but Valles would "throw
[her] out of the warehouse yelling at [her] again, calling [her]
puta, a whore," (Tr. 176:23-25). Respondent testified that, in
B.V.'s presence, petitioner physically pushed her out of the
warehouse, calling her a whore, and refusing to give her money.
(Tr. 176:19-25; 177:11.) Though she obtained court-ordered
monthly child support of approximately $103 in 2015, Valles
eventually sought to reduce this monthly amount to $70, arguing
that he had another child to support. (Tr. 178:4-17.)
Respondent contended, however, that this was a lie because
petitioner's other children had reached adulthood by then. (Tr.
178:18-23.)

Respondent also testified about petitioner's visits
with B.V., starting around three months after respondent moved
to Duran, around the time B.V. was nearly two years old. (Tr.
180.) At first petitioner would visit respondent and B.V. for a
few hours, twice a month. (Tr. 180-81.) Then, when B.V. was
older, closer to three years old, petitioner would take B.V. for
a few hours and leave respondent's home, again, twice a month.
(Tr. 181: 8-19.) Respondent testified that when she "would go
to drop B.[V.] off, when [she] would go to pick him up,"
petitioner "would not miss the opportunity to insult me and
abuse me in the presence of my son." (Tr. 166.) After B.V.
would return from these visits, he appeared to be "upset and he

would yell at [respondent] and insult [her]." (Tr. 167.)
Respondent also testified that B.V.'s behavior apparently
changed in school: the boy "started also insulting his
classmates and he would laugh about it," as reported to her by
the teacher. (Tr. 167-68.) Respondent claimed she paid for
B.V.'s school at the F.A.E. military academy and his swimming
lessons. (Tr. 179-80.)

Respondent testified that while she lived with
petitioner he kept guns in their home in the upper part of a
closet or in the lower drawers. (Tr. 175:4-15.) Respondent
testified that at one time, when she was working in Valles'
warehouse early in their relationship, she heard Valles receive
a death threat by a man named Guido. (Tr. 198-99.) She also
testified that petitioner hid weapons "in the front part of the
car in a secret compartment that had . . . a cover under the
hood," (Tr. 184:5-8), and she occasionally observed petitioner
putting guns in the hidden compartment of his truck, (Tr. 185-
87; Ex. W, Photo.). On this basis, she objected to petitioner's
driving with B.V. to a town called Pasaje because she believed
petitioner was "carrying weapons hidden in the car with [her]
son there." (Tr. 183:14-16.) She confronted petitioner about
driving B.V. while transporting hidden weapons, but petitioner
responded that she "shouldn't concern [her]self with what he is
doing." (Tr. 188:9-12.) The court credits the testimony of

B.V. and respondent that petitioner hid guns in his vehicle
while transporting B.V., and stored guns in his home.

Regarding the incident where petitioner allegedly
handed B.V. a loaded gun, respondent confronted petitioner after
hearing about the incident from B.V.  (Tr. 234:2-15.)
Petitioner denied the gun was real and insisted it was a toy
gun.  (Tr. 234:15-16.)  Respondent had asked petitioner "what
had happened with the office computer," and he responded that he
did not know, it simply "broke down," though B.V. told
respondent that the "bullet had grazed through the computer" and
"traveled near the father."  (Tr. 234:16-21.)  According to
respondent, B.V. did not have toy guns, and Valles did not keep
toy guns at his office.  (Tr. 235.)  The court credits B.V.'s
testimony that petitioner allowed him to hold a loaded firearm
that accidentally discharged and damaged petitioner's office
computer, and discredits petitioner's testimony that it was a
toy gun.

Respondent testified to instances where she believed
petitioner's daughter, Pocha, and ex-wife, Berta Cuenca, abused
B.V. or locked him in a room.  It is undisputed that petitioner
sometimes left B.V. in the care of his adult daughter Pocha, and
ex-wife Cuenca in Pasaje when he went to Guayaquil to work.
(Tr. 201-02.)  As to Cuenca, B.V. told respondent in 2017 that
Cuenca used to beat B.V. and "would leave him alone locked in

the house together with Kenneth," Cuenca's and petitioner's

eleven-year-old grandson. (Tr. 202:4-12, 203:17; 208-09.) B.V.

reported to respondent that Cuenca physically hurt him on three

occasions, but petitioner denied abuse and said respondent was

crazy when respondent confronted him. (Tr. 203-04.) Petitioner

told respondent that B.V. sustained bruises on his legs after

jumping on a mattress while staying with Cuenca. (*Id.*) As to

Pocha, respondent testified that she had heard from B.V. that

Pocha left him alone overnight, at least four times, based, in

part, on B.V.'s telling respondent that he woke up at Pocha's

house in the middle of the night to find no one there.[12] (Tr.

205-10.) Respondent offered evidence of a text message between

Pocha and B.V., date-stamped February 22, 2018, 10:09 a.m.,

where the child appears to be alone at Pocha's home and asks

Pocha where she is; Pocha tells B.V. that she is out running an

errand. (Tr. 206-07; Ex. N, Text Msg. Excerpts.)

        In another message, from B.V. to respondent around

Christmas 2017, when B.V. was away from his mother and spending

the holiday with petitioner, he stated that he missed her and

indicated he was crying. (Ex. N, Text Msg. Excerpts 8.)

Petitioner and respondent had agreed that B.V. would spend a

portion of Christmas with petitioner, though respondent

---

[12]     Respondent testified as to these statements by B.V. over petitioner's
foundation objection. (Tr. 205:10.)

testified that petitioner had left B.V. with his family in Pasaje, while petitioner returned to Guayaquil for work. (Tr. 201:6-10.) When respondent called petitioner to discuss why B.V. was upset over the Christmas holiday, petitioner told her it was not her problem, and that she should not call because he was very busy. (Tr. 208.)

Respondent also testified that at one time, B.V. returned home from a visit with his father with two red marks on his buttocks, made by petitioner with a belt. (Tr. 204:18-25.) Petitioner admitted to respondent that he had hit the child because he refused to eat. (Tr. 204-05.)

Respondent denied coercing petitioner into assisting her with obtaining visas to the United States. (Tr. 210-11.) In 2014, though petitioner had initially agreed to let B.V. travel to the United States with respondent, he apparently reneged after respondent had purchased airline tickets, and demanded respondent sign a document that would waive all of her parental rights and grant petitioner full custody of B.V. (Tr. 211:2-15.) Although petitioner threatened her with an attorney and judge who were friends, respondent refused to sign the documents, and instead sought to travel to the United States alone. (Tr. 212.) Petitioner had initially agreed to look after the child, and when respondent came to drop off B.V., petitioner became angry when he learned that respondent planned

to be away for two months.  (Tr. 212:7-15.)  He refused to look
after the child for more than one week, and respondent instead
dropped B.V. off with her family in another part of Ecuador.
(Tr. 212:16-20.)

Eventually, petitioner agreed to allow B.V. to travel
to the United States with respondent in 2016.  (Tr. 213.)
Respondent testified that B.V. loved his time in the United
States, stating he wanted to stay because he did not want
petitioner to continue to insult them.  (Tr. 213.)  Respondent
and B.V. returned to Ecuador but planned another trip in 2018.
(Tr. 214.)

In 2018, as part of an agreement, petitioner "accepted
voluntarily" respondent's plan to visit the United States with
B.V., (Tr. 227:8-9), so long as respondent and B.V. returned by
May 2, 2018, as directed by an Ecuadorian Court, (Tr. 227:10-
13).  On April 1, 2018, respondent and B.V. left again for the
United States, to visit her aunt, who had lost her Elmont home
and moved to Jackson Heights, as respondent learned after she
arrived in New York with B.V.  (Tr. 215; 227:10-13.)  Though
B.V. and respondent were scheduled to return to Ecuador on May
2, 2018, respondent chose to remain in the United States because
B.V. did not want to leave, and respondent did not want to
"subject[ him] to the usual abuse" if they returned to Ecuador.
(Tr. 216.)  Respondent was unaware that petitioner had advised

the Ecuador Family Court that respondent and B.V. had failed to
return to Ecuador.  Respondent was also unaware that her
attorney had apparently filed a document on her behalf in
Ecuador, pursuant to a 2015 authorization she had signed,
explaining that her decision not to return to Ecuador was due to
the need to take care of a sick relative in the United States.
(Tr. 216-17; Ex. 11, Counsel's Ltr.)

In July 2018, respondent emailed petitioner, attaching
a photo of B.V., stating that B.V. was fine and healthy,
requesting petitioner not harm her and B.V., and including a
phone number for petitioner to call.  (Tr. 219-20.)  Respondent
testified that she had not received a phone call from petitioner
at that number.  (Tr. 220:7-15.)  She agreed with petitioner's
counsel, however, that while she lived in Duran, she made a safe
home for her son.  (Tr. 224:11-14; 230:24-231:5.)

Respondent testified that she will not return to
Ecuador, even if B.V. is returned.  (Tr. 221:1-10.)  Respondent
stated her belief that returning would risk being put in jail by
petitioner, and that she would not be able to protect B.V. from
continued abuse by petitioner, or risk from petitioner's gun
business.  (*Id.*)  When asked by the court, respondent testified
she never requested that an Ecuadoran court "take measures to
protect her son from the physical abuse" and neglect she claims
occurred, because she feared petitioner's retaliation.  (Tr.

231:7-18.)  Specifically, she feared that he might have her killed because he "on one given occasion" had told her "he would be sending this Colombian guy to make [her] disappear," or that he might take her home away.  (Tr. 232.)  She also believed petitioner would try to put her in jail, because he told her as much after alleging she abused B.V.  (Tr. 232:18-25.) Petitioner repeated his threat of jail to respondent in May 2018, during a call that she arranged between B.V., respondent, and petitioner, after she arrived in New York with B.V.  (Tr. 219-20; 233:1-6.)  Petitioner insulted respondent during the call and told her she "would have to pay," and that "he will do everything possible to get me in jail."  Respondent was scared, and B.V. was listening, so she hung up.  Petitioner did not send any emails to respondent between May 2018 and April 30, 2019. (Tr. 220.)  Respondent also testified to her understanding that B.V. does not want to return to Ecuador because he does not want them to be abused by petitioner.  (Tr. 220.)

    4.  Arial Gould, Esq., Immigration Attorney

    Arial Gould is an immigration staff attorney with Make the Road, a non-profit organization that provides legal services to immigrants in New York.  (Resp. Prop. ¶ 4; Tr. 56:14-57:11.) Gould testified that individuals without legal status in the United States are at high risk of removal if they have "criminal convictions [or] arrests, [were] deni[ed prior] applications

[for status], or [were the subject of] a prior removal order."
(Tr. 57:22-58:6.)   She concluded that, although respondent and
child have overstayed their tourist visas, they do not face an
immediate risk of deportation.   Supporting Gould's assessment of
respondent and B.V.'s risk of deportation is the fact that New
York is a so-called "sanctuary city," which permits individuals
without lawful status to seek and receive certain City-provided
benefits without fear that certain information will be shared
with immigration authorities.   (Tr. 21:59:9.)

        Gould also testified that, even though respondent has
not yet applied for relief or a change of immigration status,
she may still do so during the pendency of any removal
proceeding.   (Stip. ¶ 61-62; Tr. 59:12-60:3; 63:10-21.)
Respondent could apply for relief under the Convention Against
Torture alleging both domestic violence and a fear of domestic
violence where the country of origin acquiesces or takes no
action to prevent domestic violence.   (Tr. 60:4-61:2.)   Gould
testified that, although her experience with Ecuador was
limited, she was "aware of a general problem . . . with domestic
violence" and "a lack of Government action" to protect victims.
(Tr. 61:4-11.)

        According to Gould, if respondent and child were the
subject of removal proceedings, the process could take three to
five years in the immigration court with an additional one to

two years for appeals to the Board of Immigration Appeals. (Tr. 63:22-64:8.) Gould testified that there was no "immediate risk of any [immigration] process [de]stabilizing [the child's] life." (Tr. 64:20-23.) In addition to the Convention Against Torture, Gould listed other ways respondent could obtain relief: seeking asylum, applying for a "withholding of removal," or applying for an "immediate relative" or "spousal" petition. (Tr. 64:12-18.)

Based on Gould's undisputed testimony, the court finds there is no immediate risk that child and respondent would be subjected to removal proceedings and that, in any event, this process would take several years to conclude and respondent has available to her several ways to obtain relief.

**B. Dr. Edward Fernandez, Psy.D.**

Dr. Fernandez is a licensed clinical psychologist in New York. (Resp. Prop. ¶ 5; Tr. 270:12-271:1; Ex. AS, Fernandez CV.) He is fluent in English and Spanish and holds a doctoral degree in clinical psychology. (Resp. Prop. ¶ 6; Tr. 271:24-274:24.) Dr. Fernandez's practice focuses on post-traumatic stress disorder ("PTSD"), personality disorder, and includes working with abused spouses. (Resp. Prop. ¶¶ 7-8.) The court qualified Dr. Fernandez as an expert in evaluating and assessing childhood trauma, and specifically here, the child's age and maturity, his ability to recount events of abuse, and risk of

psychological and physical harm if he is returned to Ecuador. (Tr. 282:18-283:19.)

In reaching his opinions, Dr. Fernandez considered over 2000 pages of the documents produced in this action and both the child's and petitioner's hearing testimony. (Ex. AT, Fernandez Materials Considered; Tr. 285:4-286:19.) He also reviewed two psychological reports, one regarding the child alone, dated July 28, 2015, (Tr. 337:4-338:9 (citing Ex. AJ, July 28, 2015, Psych. Eval.)), and the other regarding both parents and the child, dated September 7, 2015, (Tr. 290:19-20 (citing Ex. AM, Psych. Eval.)), and both conducted by mental health professional Susanna Veloz Nicola in Ecuador. Dr. Fernandez also reviewed the photos posted by petitioner on B.V.'s Facebook account, which Dr. Fernandez described as petitioner's attempt to portray a happy family. (Tr. 286-86.) Dr. Fernandez reviewed the July and September 2015 psychological reports of the parents and B.V. by the Ecuadorian psychologist, filed as part of the 2015 proceeding brought by petitioner alleging abuse by respondent. (*See* Ex. AJ, July 28, 2015, Psych. Eval.; Ex. AK, Aug. 20, 2015 Op.; Ex. AL, H'rg Record; Ex. AM, Psych. Eval.) Dr. Fernandez noted the visitors' log showed that respondent and B.V. had appeared for family therapy recommended by the Ecuadorian Family Court, but petitioner did not. (Exs. AB, Visitor Log; Ex. AI, Soc. Worker Rept. 4; Tr.

288-89, 292:12-16, 292:22-23, 296:9-15.) As the court has already noted, though, it cannot conclude that petitioner was necessarily ordered to attend these sessions during the dates on the visitor's log, based on the record before it. Dr. Fernandez also reviewed the hearing testimony of petitioner and the child, B.V.

In advance of the hearing held by this court, Dr. Fernandez interviewed and evaluated both child and respondent. (Resp. Prop. ¶ 10; Ex. AT, Fernandez Materials Considered; Tr. 285:4-286:19.) He interviewed B.V. for approximately 30 to 45 minutes in the child's home and outside the presence of respondent. (Tr. 325:9-327:1; 302:15-16.) Dr. Fernandez testified at the hearing that the child became emotional and began to "dissociate" when his questioning turned to "the traumas that [the child] experienced perpetrated by [petitioner]." (Tr. 326:1-6.) The court notes that B.V. exhibited similar discomfort during the court's *in camera* examination when he described the physical and emotional abuse by petitioner. Like Dr. Fernandez, the court did not press for extensive responsive, given the child's apparent discomfort answering questions.

Dr. Fernandez also interviewed respondent for approximately 90 minutes, outside the presence of the child, though at one point the child entered the room to retrieve

something, observed his mother crying, and attempted to console
her.  (Tr. 326:10-20; ECF No. 18, Fernandez Rept. 7.[13])

As a result of his examination of both B.V. and his
mother, Dr. Fernandez testified that respondent and B.V. have a
"very strong bond" and that respondent provides a stable living
environment for her son.  (Tr. 307:1-8; 315:2-9.)  Moreover,
Dr. Fernandez testified that he did not observe signs of
"loneliness, anger or fear of abandonment" in the child.  (Tr.
344:17-19.)  He testified that the child was "very stable,
joyful, happy," had a "secure relationship with his mother and
his aunt," and took part in "recreational activities."  (Tr.
344:21-25.)

Dr. Fernandez did not, however, explore the
possibility of trauma from the child's alleged abduction by
respondent, and his removal from his community in Ecuador.  (Tr.
334:6-24; 335:15-21.)  He allowed that it was possible that a
child, "taken by a parent without authorization" to another
country, could "experience loss of community and stability,
leading to loneliness, anger, and fear of abandonment."  (Tr.
335:15-21.)  Dr. Fernandez recalled that the child referred to
some "limited social network" in Ecuador, including his
connections through school, but could not recall the names of

---

[13]    Respondent did not offer, and the court did not admit, Dr. Fernandez's
report of his interview and assessment of B.V. at the hearing.  Instead,
respondent filed it in advance of the hearing

any specific friends the child may have mentioned.  (Tr. 336.)

He concluded that B.V.'s "connection to that community, . . .

wasn't anything that [he] found . . . specifically relevant to .

. . the areas [he] commented on."  (*Id.*)  Though Dr. Fernandez

recalled reading that "the child has a fear that his friends

back in Ecuador have forgotten him," it did not come up during

his interview with the child.  (Tr. 336:22-337.)

Dr. Fernandez offered three opinions, rendered with a

degree of psychological certainty based on B.V.'s testimony,

observed behaviors, and documents regarding his developmental

progression.  First, he opined that B.V.'s age and maturity

allow for consideration of the child's expressed desire not to

return to Ecuador.  Dr. Fernandez based his first opinion

regarding B.V.'s emotional and intellectual maturity on his

observations of B.V. expressing empathy toward his mother, his

description of a logical sequence of events that led to his

decision, including specific incidents that "led him to his own

decision that he does not want to be with his father."  (Tr.

300.)

In relation to this first opinion, Dr. Fernandez found

that B.V. had not been influenced by external forces.  His

review of the psychological reports from Ecuador indicated that

although there was no evidence that the mother had tried to

influence B.V. during the abuse proceeding commenced by

petitioner, there was evidence that petitioner had tried to influence B.V. to say he had been abused. Dr. Fernandez testified that his review of documents and interviews "established a pattern of behavior that the child . . . is able to tell the truth." (Tr. 301.)

Second, Dr. Fernandez opined that B.V.'s account of physical and emotional abuse was not based on respondent's influence. Dr. Fernandez stated that B.V.'s recent school essay calling his sister, Pocha, a dog was "particularly troubling" given the spontaneity and emotional content of that word in Spanish, which showed B.V. had his "own experience of abuse and ma[de] his own determination about it." (Tr. 301.) According to Dr. Fernandez, B.V.'s school essay, (Ex. Q, School Essay), reflects a strong, visceral use of a culturally grotesque and nasty word for a woman which use indicates extreme abuse. (Tr. 301; 320-21.) In the essay, B.V describes being locked in by his sister, Pocha, with whom petitioner admitted leaving B.V. for sleepovers. The unprompted use of the word "perra" by B.V. in his essay, demonstrates a strong response and extreme emotions which, in Dr. Fernandez's experience, arise from extreme abuse. Although B.V. did not discuss with Dr. Fernandez being tied up by Pocha, he did tell Dr. Fernandez that his father had tied him up and let him alone. Based on B.V.'s essay, Dr. Fernandez found accurate B.V.'s account of being

placed in an area of seclusion with no information or
accessibility to anyone else, until someone comes back for him.
(Tr. 321-22.)  According to Dr. Fernandez, the intense fear that
a child expresses about being left alone, as recounted by
petitioner, has many different negative psychological effects.
(Tr. 319.)

Dr. Fernandez also concluded that B.V.'s account of
abuse by petitioner was not unduly influenced by his mother,
based on the pattern of behavior and spontaneity of his
responses.  (*Id.* at 302.)  Although B.V. and Dr. Fernandez had a
good rapport at the beginning of their interview when B.V.
answered questions about his life in Ecuador and New York,
B.V.'s emotional responses "completely changed when discussing
incidents of abuse . . . back in Ecuador."  B.V. demonstrated
similar behaviors during his interviews with Dr. Fernandez and
the court, turning away as he spoke, attempting to self soothe
with short answers, seeking his mother's comfort and asking when
the interview would end.  (Tr. 304.)  Rather than evading
telling the truth, Dr. Fernandez testified that in his
experience with children, B.V.'s response was specific to an
abuse response as the child engaged in self-soothing behaviors.

Dr. Fernandez, who focused his evaluation on the
child, also interviewed respondent and found her responses were
consistent with experiencing domestic violence over a lengthy

period of time, based on her emotional reactions and difficulty discussing the topic. (Tr. 306.) Dr. Fernandez found that respondent and B.V. share an emotional closeness and respondent provides a stable living environment, and overall stable mental health for both. (Tr. 307.) Dr. Fernandez further testified that B.V. was a "very stable, joyful, happy child that looked to be emphatic and have a secure relationship with his mother and his aunt." (Tr. 344.)

Dr. Fernandez explained respondent's reluctance to return to Ecuador was based on respondent doing everything in her power to keep her son with her for what she believes is his protection, based on the nature of the abuse. The statement of respondent that she would not return to Ecuador if B.V. is returned, was, in Dr. Fernandez's experience, based on respondent's inability to even fathom a possibility that would cause extreme emotional distress because she has found stability and distance from severe trauma and is able to provide for her son. (Tr. 308.) Dr. Fernandez added that respondent experienced extreme emotional abuse from petitioner that caused trauma by being financially deprived and called derogatory names, and that such emotional trauma is often overlooked because it is not visible like physical abuse. The court finds that B.V. suffered physical and emotional abuse and witnessed his mother suffering the same.

As his third opinion, Dr. Fernandez's concluded that B.V. will "be at grave risk if returned to Ecuador or placed in the custody or environment with his father," based on petitioner's failure to recognize and accept responsibility for his abuse of B.V. (Tr. 299.) Dr. Fernandez testified that petitioner denied, qualified, or minimized the hitting of B.V. with a belt by stating it was a girl's belt. (Tr. 313-14.) Based on petitioner's testimony and Dr. Fernandez's understanding that petitioner failed to participate in family therapy sessions in Ecuador, Dr. Fernandez testified that a risk of recidivism is high when an abuser fails to accept or recognize abuse, or minimizes his own conduct, and the abusive behavior will not change. (Tr. 313-14.)

The court finds, based on the foregoing clear and convincing evidence, that B.V. suffered physical and emotional abuse by petitioner and petitioner's relatives, and that, based on clear, convincing, and undisputed psychological evidence, B.V. faces a grave risk of physical and psychological harm if he is returned to petitioner's custody in Ecuador. The court further finds, based on its own observations and Dr. Fernandez's testimony, that B.V. is of sufficient age and maturity, for the court to consider B.V.'s strong objection to being returned to Ecuador and seeing his father.

**CONCLUSIONS OF LAW**

"The Hague Conference on Private International Law
adopted the Hague Convention on the Civil Aspects of
International Child Abduction in 1980." *Chafin v. Chafin*, 568
U.S. 165, 168 (2013) (citing T.I.A.S. No. 11670, S. Treaty Doc.
No. 99-11). The Convention seeks to protect children from the
harmful effects of wrongful removal, and accordingly establishes
procedures to ensure their prompt return to the state of their
habitual residence. *Abbott v. Abbott*, 560 U.S. 1, 8 (2010).
The selected remedy of repatriation is "designed to 'preserve
the status quo' in the child's country of habitual residence and
'deter parents from crossing international boundaries in search
of a more sympathetic court.'" *Souratgar v. Lee*, 720 F.3d 96,
102 (2d Cir. 2013) (quoting *Blondin v. Dubois* ("*Blondin II*"),
189 F.3d 240, 246 (2d Cir. 1999)).[14]

The United States has ratified the Convention through
the International Child Abduction Remedies Act ("ICARA").
*Chafin*, 568 U.S. at 168. ICARA authorizes a person seeking a

---

[14] There are four *Blondin* decisions relevant to this Order: (1) *Blondin v. Dubois*, 19 F. Supp. 2d 123, 124-26 (S.D.N.Y. 1998) ("*Blondin I*") (finding grave risk of harm  exception applied); (2) *Blondin v. Dubois*, 189 F.3d 240, 242-44 (2d Cir. 1999) ("*Blondin II*") (affirming finding of grave risk but remanding for district court to determine whether ameliorative measures could mitigate risk of harm); (3) *Blondin v. Dubois*, 78 F. Supp. 2d 283, 288-93 (S.D.N.Y. 2000) ("*Blondin III*") (finding that no ameliorative measures would overcome grave risk of harm due to relapse of children's traumatic stress disorder); and (4) *Blondin v. Dubois*, 238 F.3d 153, 157 (2d Cir. 2001) ("*Blondin IV*") (affirming finding below and approving district court's consideration of child's well-settlement and expressed wishes to remain in the United States under Article 13(b)).

child's return to file a petition in state or federal court and instructs that the court "shall decide the case in accordance with the Convention." 22 U.S.C. §§ 9003(a)-(b), (d). If the child in question has been "wrongfully removed or retained within the meaning of the Convention," the child shall be "promptly returned," unless one of the exceptions expressly provided for in the Convention applies. *Id.* § 9001(a)(4).

The petitioner bears the initial burden of proving that the child was wrongfully removed or retained by a preponderance of the evidence. *Souratgar*, 720 F.3d at 102; 22 U.S.C. § 9003(e)(1)(A). Once the petitioner establishes that the removal or retention was wrongful, the child "must be returned *unless* the [respondent] can establish one of four affirmative defenses." *Souratgar*, 720 F.3d at 102 (emphasis added).

Respondent's burden of proof in proving an affirmative defense turns on which defenses she invokes. Though there are four exceptions that a respondent may invoke to overcome a petitioner's prima facie case, only two are relevant here[15]:

---

[15]  The Convention enumerates four affirmative defenses: (1) the petition was filed more than a year after the child was wrongfully removed and "the child is now settled in its new environment," Hague Convention, art. 12; (2) the petitioner "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention," *id.*, art. 13(a); (3) "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," *id.*, art. 13(b); and (4) the return of the child "would not be permitted by the fundamental

Article 13(b)'s so-called "grave risk" defense; and the
unnumbered Article 13 defense permitting the court to consider a
mature child's objections to return.  (*See* Resp. Prop. 25, ¶ 6.)
*First*, a respondent may prove by *clear and convincing evidence*[16]
that there is a "grave risk" that returning the child would
expose him or her to physical or psychological harm.  22 U.S.C.
§ 9003(e)(2)(A).  *Second*, a respondent may prove by a
*preponderance of the evidence*[17] that the child objected to being
returned and "ha[d] attained an age and degree of maturity at
which it [wa]s appropriate to take account of [the child's]
views."  *Id.* § 9003(e)(2).

Even where an affirmative defense has been
established, it remains within the discretion of a court whether
to allow the child to remain with the abducting parent or to
order repatriation.  *See Souratgar*, 720 F.3d at 102-03; *In re*

---

principles . . . relating to the protection of human rights and fundamental
freedoms," *id.*, art. 20.  Additionally, Article 13 includes an unnumbered
provision whereby the court can consider a child's objection to return if the
child has attained an age and maturity where it is appropriate to consider
their wishes. *Id.*, art. 13.

[16]   To meet the clear and convincing evidence standard, the evidence
presented must "place in the ultimate factfinder an abiding conviction that
the truth of the factual contentions is highly probable." *Colorado v. New
Mexico*, 467 U.S. 310, 314 (1984) (explaining that to meet the clear and
convincing evidence standard, the evidence presented must "place in the
ultimate factfinder an abiding conviction that the truth of the factual
contentions is highly probable"); *see also* Black's Law Dictionary (10th ed.
2014) (defining "clear and convincing" as "highly probable" or "reasonably
certain").

[17]   To meet the preponderance of the evidence standard, the evidence
presented must "prove that the fact is more likely true than not true."
*Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997); *Henry v. Dep't of
Transp.*, 69 F. App'x 478, 480 (2d Cir. 2003).

*D.T.J.*, 956 F. Supp. 2d 523, 529 (S.D.N.Y. 2013).  Moreover, the
Second Circuit has emphasized that these exceptions are to be
interpreted narrowly.  *Souratgar*, 720 F.3d at 102-03 ("[E]ven
where the grounds for one of these 'narrow' exceptions have been
established, the district court is not necessarily bound to
allow the child to remain with the abducting parent." (quoting
*Blondin II*, 189 F.3d at 246 n.4)); *see also Lozano v. Alvarez*,
697 F.d 41, 56 (2d Cir. 2012).

        Here, as discussed below, petitioner has clearly met
his burden of establishing a *prima facie* case, of wrongful
removal or retention under the Hague Convention.  Respondent,
however, has also demonstrated by clear and convincing evidence
that returning B.V. would subject him to a "grave risk" of
physical or psychological harm, making return discretionary.

## I.    *Prima Facie* Case of Wrongful Removal

        The court first evaluates petitioner's *prima facie*
case of wrongful removal or retention.  Petitioner must
demonstrate that:

(1)    the child was habitually resident in one State and has
        been removed to or retained in a different State;
(2)    the removal or retention was in breach of the
        petitioner's custody rights under the law of the State
        of habitual residence; and
(3)    the petitioner was exercising those rights at the time
        of the removal or retention.

*Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005); *see also*
22 U.S.C. § 9003(e)(1)(A).  The petitioner must establish these

requirements by a preponderance of the evidence. 22 U.S.C. §
9003(e)(1)(A). Respondent apparently does not dispute that
petitioner established each element of his *prima facie* case, and
instead only argues the defenses discussed above. (Resp. Prop.
25-26.) Nevertheless, the court must satisfy itself that
petitioner has met his burden and, based on the following, finds
that he has.

### A.   Habitual Residence

*First*, the petitioner must show that the child was
habitually resident in the state from which he or she was
removed. *Gitter*, 396 F.3d at 130-31.[18] Though the Hague
Convention does not define "habitually resident," *id.* at 131,
the parties have apparently stipulated that Ecuador was the
child's "habitual residence," and the court finds this
requirement is satisfied. (Stip. ¶ 7; Pet. Prop. 16.)

### B.   Removal in Breach of Custody Rights

*Second*, the petitioner must show that the removal was
in breach of his or her custody rights under the laws of the
State of habitual residence. *Gitter*, 396 F.3d at 130-31.

---

[18]   Article 4 of the Hague Convention provides that "[t]he Convention shall
apply to any child who was habitually resident *in a Contracting State*
immediately before any breach of custody or access rights." Hague
Convention, art. 4 (emphasis added). Ecuador is both a party to the Hague
Convention and a U.S. Treaty Partner. *See U.S. Hague Convention Treaty
Partners*, U.S. Dep't of State, https://travel.state.gov/content/travel/
en/International-Parental-Child-Abduction/International-Parental-Child-
Abduction-Country-Information/Ecuador.html (last accessed October 2, 2019).

Federal courts look to the "law of the child's place of habitual residence to determine whether a petitioner possessed lawful rights of custody at the time of a child's removal." *Norden-Powers v. Beveridge*, 125 F. Supp. 2d 634, 638 (E.D.N.Y. 2000). Custody rights include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a); *see also Norden-Powers*, 125 F. Supp. 2d at 638. Moreover, "a court 'may take notice directly of the law of . . . the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law.'" *Lachhman v. Lachhman*, No. 08-CV-4364, 2008 WL 5054198, at *6 (E.D.N.Y. Nov. 21, 2008) (quoting Hague Convention, art. 14).

The Supreme Court has held that the right of a parent to consent before a child is removed from the country—so-called *ne exeat* rights—is a right of custody for purposes of the Hague Convention. *Abbott*, 560 U.S. at 10. Thus, an abducting parent's failure to comply with the terms of a travel authorization pursuant to the habitual residence's statutory *ne exeat* rights has been found "wrongful" pursuant to the Convention. *In re R.V.B.*, 29 F. Supp. 3d 243, 254 (E.D.N.Y. 2014).

Petitioner notes, and the court agrees, that it is undisputed that he held *ne exeat* rights over B.V. pursuant to

Ecuadorian law.  (Pet. Prop. 17 (citing Tr. 210:20-211:7).)  It
is also undisputed that respondent had traveled to the United
States on April 1, 2018, with B.V., pursuant to a court-ordered
travel authorization.  (Stip. ¶ 37; Ex. 9, Travel Auth. 2.)
Pursuant to the court's travel authorization, respondent was to
return B.V. to Ecuador by May 2, 2018, (Travel Auth. ¶¶ 3-6),
but failed to return the child on or before that date and has
since refused to return since leaving in April 2018.  (Stip. ¶
42.)  Petitioner's claim is supported by a declaration by the
Ecuadorian Family Court authorizing respondent's limited travel
with B.V., and stating that respondent's "permit granted to
leave the country is now expired" and recognizing petitioner's
right to "initiate the international recovery process" of B.V.
(Ex. 12, Ecuador Family Ct. Decl. 1.)  Therefore, this court
concludes that respondent's failure to return the child to
Ecuador by May 2, 2018, breached petitioner's custodial rights
protected by the Hague Convention.

## C.  Custody Rights Exercised at Time of Removal

*Finally*, the petitioner must show that the petitioner
was exercising his or her custody rights at the time of the
child's removal.  *Gitter*, 396 F.3d at 130-31.  "[T]he standard
for evaluating whether a petitioner is exercising custody at the
time of removal is fairly lenient."  *Kosweski v. Michalowska*,
No. 15-CV-928, 2015 WL 5999389, at *14 (E.D.N.Y. Oct. 14, 2015).

"A person cannot fail to exercise [his] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Souratgar v. Fair*, No. 12-CV-7797, 2012 WL 6700214, at *4 (S.D.N.Y. Dec. 26, 2012), (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)), *aff'd sub nom. Souratgar v. Lee*, 720 F.3d 96 (2d Cir. 2013). The court must "avoid[] the question whether the parent exercised the custody rights well or badly" as "[t]hese matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts." *Olguin v. Santana*, No. 03-CV-6299, 2004 WL 1752444, at *5 (E.D.N.Y. Aug. 5, 2004) (quoting *Friedrich*, 78 F.3d at 1066). The Supreme Court has noted that a "parent can exercise the *ne exeat* right by declining consent to the exit or placing conditions to ensure the [child's] move will be in the child's best interests." *Abbott*, 560 U.S. at 13.

As noted above, respondent does not dispute petitioner's *prima facie* case, or that Valles exercised his custodial rights and took no actions evincing a "clear and unequivocal abandonment" of B.V. at the time of his unlawful retention in the United States. He usually saw B.V. on weekends and holidays, had custody of B.V. around Christmas 2017, and saw the child as recently as the month prior to his April 2018 departure from Ecuador. (Tr. 79:3-8; 84:12-25.) Respondent and

child both corroborated the father's testimony to this point. (Tr. 20:12-14, 180:10-181:20, 182:9-20.) The court finds that petitioner exercised his custodial and *ne exeat* rights by maintaining visits with B.V., and by first declining to consent to B.V.'s travel and then by consenting to limited-duration travel in 2018. Moreover, petitioner promptly responded to B.V.'s unlawful retention by seeking a declaration from the Ecuador Family Court which had authorized his travel. (*See* Ecuador Family Ct. Decl.)

The court finds, therefore, that petitioner exercised his custodial rights at the time of B.V.'s unlawful retention in the United States and, furthermore, that he has met his burden of establishing a *prima facie* case of wrongful retention of B.V. by respondent. The court must order the child promptly returned, unless respondent can carry her burden as to either of the two defenses she asserts.

## II.      Respondent's Asserted Exceptions

Respondent raises two defenses under the Hague Convention. First, she argues that repatriation would expose the child to a grave risk of harm given petitioner's abuse of the child and of herself. Second, she argues that the child has attained an age and maturity such that his objections to return should be taken into account. The court addresses the so-called "child's objection" defense first before turning to the "grave

risk" defense, as the former can provide support for a finding of the latter. *Blondin IV*, 238 F.3d at 165. Furthermore, though respondent does not and cannot, given that the required statutory period has not lapsed, argue for application of the Convention's Article 12 defense, the court may also consider whether the child is well-settled in his new environment under an Article 13(b) defense. *See Blondin IV*, 238 F.3d at 164-65.

### A.    Article 13: "Child's Objection" Exception

Respondent invokes Article 13's unnumbered provision as a defense, which is often termed the "age and maturity defense," the "mature child exception," or the "child's objection defense." *See Haimdas*, 720 F. Supp. 2d at 204. Article 13 permits the court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views." Hague Convention, art. 13. As noted above, and in contrast to the grave risk exception, respondent bears the burden of proving this exception by the lower standard of a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). If the child is sufficiently mature, the court may take his objection into consideration in denying a petition. *Blondin II*, 238 F.3d at 166.

Though the child's objection to repatriation "may be conclusive," the Convention only calls for the court to "take account of" the mature child's views, not to acquiesce. *Haimdas*, 720 F. Supp. 2d at 204. When considering a child's objections, the *Haimdas* court emphasized its discretion in granting a petition in the face of any proven exception because of the "potential for undue influence" by the abducting parent, whether or not the influence is calculated or intended. *Id.; see also Anderson v. Acree*, 250 F. Supp. 2d 876, 884 (S.D. Ohio 2002) (taking nine year old's opinion into account but nevertheless finding it not conclusive when "his memories of [his habitual residence] . . . are those of a six year old" and where the child "ha[d] been in the virtually exclusive custody of his mother in the United States since his removal," and because "his mother has articulated a desire not to return . . . since almost the beginning of her arrival in [the United States]").

The court is not aware of any established objective criteria or tests assessing a child's maturity for purposes of the Hague Convention. *Id.* at 205-06 (citing Anastacia M. Greene, *Seen and Not Heard? Children's Objections Under the Hague Convention on International Child Abduction*, 13 U. Miami Int'l & Comp. L. Rev. 105, 132 (2005)). The Second Circuit, however, has observed that the standard should be relatively

demanding.  *Blondin II*, 238 F.3d at 166.  Courts should also distinguish "between a child's 'objection' to return . . . 'and a child's wishes as expressed in a custody case.'"  *Haimdas*, 720 F. Supp. 2d at 205-06.

Given the lack of criteria, a review of cases may be less helpful as they often turn on the *impression* a child left on the court through her testimony, demeanor, and mannerisms. Courts consider both the age of the child and the nature of their objections to return.  Though "[t]he Convention does not establish a minimum age at which a child is old enough and mature enough to trigger this provision," *Blondin IV*, 238 F.3d at 166, generally, courts more heavily weigh testimony from children older than B.V.  *See, e.g.*, *Matovski v. Matovski*, No. 06-CV-4259, 2007 WL 2600862, at *14 (S.D.N.Y. Aug. 31, 2007) (holding that 12 and 11 year old children sufficiently objected to return where they testified that they had more family and friends in the United States, enjoy a more stable life, and are concerned about uncertainties that they would face in home country); *Diaz Arboleda v. Arenas*, 311 F. Supp. 2d 336, 343–44 (E.D.N.Y. 2004) (holding that 12- and 14-year-old children sufficiently objected to return where they expressed preference of staying with their mother and believed that they would have better opportunities in this country); *Laguna v. Avila*, No. 07-CV-5136, 2008 WL 1986253, at *11 (E.D.N.Y. May 7, 2008) ("The

Court was most impressed as [the child] testified calmly but with deep feeling that he believes that the United States will provide him personally with far better opportunities in life than Colombia, because America 'has more economy, more business, more industry, more opportunities, things like that.'"); *Broca v. Giron*, No. 11-CV-5818, 2013 WL 867276, at *10 (E.D.N.Y. Mar. 7, 2013) (finding 15-year-old child mature where she was aware of her precarious immigration status and balanced risks and rewards of her situation).

The greater weight accorded the wishes of children older than twelve years of age is especially so where the child demonstrates mature concerns and some recognition of the import of their situation, and courts tend to discount objections that are based more on a child's fancy rather than concerns of the future. *See id.* (honoring 15-year-old child's "particularized, mature objections to returning to [her home country]"); *Haimdas*, 720 F. Supp. 2d at 207 (finding child, nearly 10 years old, not sufficiently mature in part because his objections were based on an aversion to the United Kingdom's weather, inferior athletic opportunities, and lack of gym or science classes). Moreover, courts give the child's wishes less weight when they stem from a preference for one parent over the other. *See id.* (describing child's objection as "an intensely favorable comparison" of life with child's abducting parent with the child's recollection of

life with the petitioner parent, which had "clearly been impacted" by respondent).  The same is true when the child's objections amount to a "simple preference for the luxuries of living in New York, not an objection to returning to" their home country.  *In re Skrodzki*, 642 F. Supp. 2d 108, 117-18 (E.D.N.Y. 2007) (discounting twelve-year-old child's declaration which listed aspects of New York life he enjoyed including the beach, an amusement park, larger and less-crowded movie theaters, and his school friends and cousins).

B.V. was nine years old during his *in camera* interview with the court.  He was clearly intelligent in his responses and apparently aware of the nature of the proceedings.  The child also demonstrated an understanding of the difference between what is true and what is not, and the importance of telling the truth for the instant proceedings.  He was in third grade at the time of the hearing and may have had to repeat the grade.  (Tr. 19:21-23.)  Notably, B.V. testified in English occasionally, although he was assisted by an interpreter.  He unequivocally does not want to return to Ecuador, and his testimony to that effect is clear.  His bases for not wishing to return are varied.  B.V. was first asked about visits with his father in Ecuador and he stated their weekly visits diminished "because I didn't want to see him" because "he will call me names, . . . hit me with a belt . . . and leave me with my sister, who would

lock me up inside the house." (Tr. 21.) He first stated that
he did not want his father to take him to Ecuador because he
hated his half-brothers who mistreat him by locking him in the
house and make him "do everything for them." (Tr. 44.) B.V.
further testified that during a court-ordered visit during the
show cause hearing his father told him he was going to take him
to Ecuador, and B.V. expressed that he did not want petitioner
to take him to Ecuador. (Tr. 43.) B.V. explained that "I also
hate my father" because "he beats me. He leaves me alone. He
also hates me." (Tr. 44-45.) B.V. added that his father
"mistreats [him]," and repeated three times "he hates me," and
concluded "I feel more pain," and clarified that he feels anger.
(Tr. 45.) B.V. also expressed hate and dislike of his older
half-sister, Pocha, because she left him alone, and he believed
she hated him, but conceded they sometimes played together.
(Tr. 45-46.)

The child also appears to enjoy living in New York,
but for rather peculiar reasons. He testified life in New York
was good because there was less trash here than in Ecuador and
that in Ecuador there was more vehicular accidents because of
inoperable traffic lights. (Tr. 46-47.) When asked about his
family in Ecuador, B.V. testified that he felt his father's
family is "bad," his mother's family is "good," and that he
would feel "bad" and "a little nervous" at the prospect of

returning.  That is, he felt anger towards his father, but also nervous that his friends and family in Ecuador would not remember him after his time away.  (Tr. 47.)  During this testimony, B.V. asked when the interview would end and stated that he wanted to be with his mother.  (Tr. 45, 47.)  B.V. also testified that he has friends and attends church in New York. (Tr. 48.)  When asked most directly if he would "rather stay [in New York] or go back to Ecuador" the child responded that he preferred to be in New York "[w]ith my mom," and did not want to return to Ecuador or live with his father, stating again "[b]ecause he mistreats me and abuses me."  (Tr. 49:1-11.)

Dr. Fernandez also concluded, based on his examination of B.V., that he was sufficiently mature, and had expressed specific reasons for not wanting to return to Ecuador.  (Tr. 300:14-25.)  The court finds B.V. is articulate and mature and has sufficiently articulated compelling and credible reasons, including physical and verbal abuse, for objecting to return to Ecuador.  The court will consider the child's preferences and reasons for remaining in New York but does not find them to be conclusive.  B.V. did not fear the prospect of returning, but expressed strong hatred and nervousness about the past abuse, and nervousness about seeing his family and friends in Ecuador. His distaste for Ecuador's trash and traffic are observations of this child who has lived in both countries.  The child also

noted that his mother's family was good.  Two aspects of the
child's wishes stand out.  First, his initial reason for wishing
to stay is that his half-brothers mistreat him.  Although B.V.
did not specifically testify about instances of abuse by his
father abuses him, and his half-brothers, the court was mindful
of the child's emotional discomfort in describing abuse by his
father, his father's ex-wife, and his half-sister.  Second, the
child's preference to remain in New York with his mother instead
of returning to Ecuador with his father could reasonably be
expected as he has spent most of his life with his mother.  Yet,
the court finds that B.V.'s preference repeatedly was explained
by B.V. in terms of the abuse by petitioner and B.V.'s strong
feelings of hatred and sense that his father hates him.  A
return to Ecuador, however, would not necessarily result in
awarding custody to his father or that the child must decide
which parent he likes more.  Thus, the court finds that
respondent has met her burden to establish that B.V. objects to
being returned and has attained an age and degree of maturity at
which it is appropriate to take account of his views, though not
at the exclusion of other considerations.  The court will,
therefore, consider B.V.'s articulate views as it considers
respondent's Article 13(b) exception below.

**B.   Article 13(b): "Grave Risk of Harm" Exception**

      1.   Legal Standard

Respondent next invokes Article 13(b)'s grave risk
exception.  Pursuant to Article 13(b) of the Hague Convention, a
court need not order the return of a child if "there is a grave
risk that his or her return would expose the child to physical
or psychological harm or otherwise place the child in an
intolerable situation."  Hague Convention, art. 13(b).
Respondent must establish this exception by clear and convincing
evidence.  22 U.S.C. § 9003(e)(2)(A).  "Subsidiary facts[,
however,] may be proven by a preponderance of the evidence."
*Souratgar*, 720 F.3d at 103 (citation omitted).  Thus, "there may
be twenty facts, each proved by a preponderance of the evidence,
that in the aggregate create clear and convincing evidence."
*Danaipour v. McLarey*, 183 F. Supp. 2d 311, 315 (D. Mass. 2002)
("The district court held that subsidiary facts must be proved
by a preponderance of the evidence, a standard we accept."),
*rev'd on other grounds*, 286 F.3d 1, 13 (1st Cir. 2002).

The Second Circuit has cautioned that the grave-risk
exception is a narrow one.  Courts must carefully consider the
alleged risks arising from repatriation of the child:

> [A]t one end of the spectrum are those situations where
> repatriation might cause inconvenience or hardship,
> eliminate certain educational or economic opportunities, or
> not comport with the child's preferences; at the other end
> of the spectrum are those situations in which the child
> faces a real risk of being hurt, physically or
> psychologically, as a result of repatriation. The former do
> not constitute a grave risk of harm under Article 13(b);
> the latter do.

*Blondin II*, 238 F.3d at 162. "[T]he risk to the child [must be] grave, not merely serious." Legal Analysis: The Hague Convention on the Civil Aspects of Int'l Child Abduction, 51 Fed. Reg. 10494, 10510 (1986).

Under Article 13(b), a grave risk of harm arises "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Souratgar*, 720 F.3d at 103 (citing *Blondin IV*, 238 F.3d at 162). "The potential harm to the child must be severe, and the '[t]he level of risk and danger required to trigger this exception has consistently been held to be very high.'" *Id.* at 104. Moreover, "[t]he grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize." *Id.* (citing *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005)). This is all to say that the risk of harm must truly be grave. *See also In re Lozano*, 809 F. Supp. 2d at 220. "The Second Circuit has repeatedly emphasized that, to prevail on the 'grave risk' defense, there must be 'evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation.'" *In re D.T.J.*, 956 F. Supp. 2d at 543 (quoting *In re Lozano*, 809 F. Supp. 2d at 221).

It is important to note, however, that Article 13(b) relief is not limited only to instances where repatriation poses the threat of physical harm. *See Souratgar*, 720 F.3d at 104. Rather, repatriation may also be inappropriate if it "pose[s] a grave risk of causing unavoidable psychological harm to the child." *Id.* (citing *Blondin IV*, 238 F.3d at 160-61). Thus, abuse directed at the respondent and witnessed by the child has been found to present a grave risk of harm to the child. The Second Circuit has recognized that "[m]any cases for relief under the Convention arise from a backdrop of domestic strife." *Souratgar*, 720 F.3d at 103. However, as this exception is to be interpreted narrowly, partner-respondent abuse "is only relevant under Article 13(b) if it seriously endangers the child." *Id.* at 103-04.

In this vein, the Supreme Court has recognized that a mother might demonstrate "grave risk" to "her own safety" and thereby establish that "the child too would suffer 'psychological harm' or be placed 'in an intolerable situation.'" *Abbott*, 560 U.S. at 22 (citing *Baran v. Beaty*, 526 F.3d 1340, 1352-53 (11th Cir. 2008) and *Walsh v. Walsh*, 221 F.3d 204, 220-21 (1st Cir. 2000)). In *Walsh*, a First Circuit decision cited by the Supreme Court as an example of spousal abuse leading to a grave risk of harm to the child, there was ample evidence of severe spousal abuse over an extended period

68

and a well-documented history of violence and disregard for the law by petitioner. *See Walsh*, 221 F.3d at 209–12. The court must therefore ask "not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Souratgar*, 720 F.3d at 104.

In accordance with the foregoing guidance, courts have closely considered the severity, and corresponding risks, of the alleged spousal abuse in considering whether it presents a grave risk of harm to the child. Repatriation is not appropriate where "the petitioner showed a 'sustained pattern of physical abuse and/or a propensity for violent abuse' that presented an intolerably grave risk to the child." *Souratgar*, 720 F.3d at 104 (quoting *Laguna v. Avila*, No. 07-CV-5136, 2008 WL 1986253, at *8 (E.D.N.Y. May 7, 2008)); *see also Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 408 (E.D.N.Y. 2005) (denying petition where children had experienced physical abuse from father, had witnessed his abuse of their mother, and expert testified that their mere return to Israel would trigger their post-traumatic stress disorders, as well as 14-year-old child's suicidal ideations); *cf. Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000) (affirming district court decision that a husband's verbal abuse and an incident of physical shoving directed at his wife was insufficient to establish a grave risk of harm to the

child).  Psychological abuse of the respondent alone, in the
form of shouting or other displays of uncontrolled anger in the
presence of the child, can support an Article 13(b) defense if
it is substantial and pervasive.  *Davies v. Davies*, 717 F. App'x
43, 48-49 (2d Cir. 2017).  The case law in this Circuit,
however, does not support the conclusion that "[s]poradic or
isolated incidents of physical discipline directed at the child,
or some limited incidents aimed at persons other than the child,
even if witnessed by the child," constitute a grave risk.
*Souratgar*, 720 F.3d at 104.

Additionally, repatriation would not be appropriate if
it would unavoidably trigger recurrence of a child's traumatic
stress disorder.  *Blondin IV*, 238 F.3d at 160-61 (affirming
denial of petition to repatriate after an expert psychologist
opined that returning children to France, where they had been
abused by their father, would likely trigger recurrence of PTSD,
and that no arrangement could mitigate this risk); *Reyes Olguin
v. Cruz Santana*, No. 03-CV-6299, 2005 WL 67094 (E.D.N.Y. Jan.
13, 2005) (finding grave risk where return would trigger child's
PTSD and where child testified to desire to kill himself with
father's knife if returned).

Thus, after the Second Circuit's decisions in the
*Blondin* cases, courts in this Circuit have denied repatriation
under the grave risk exception where the alleged abuse shocked

the conscience and was substantial. *See, e.g.*, *Elyashiv*, 353 F. Supp. 2d at 408-09 (finding grave risk where father beat the children once or twice a week, threatened to kill his son and wife with weapons he kept in the house and where children were diagnosed with PTSD and expressed suicidal thoughts); *Reyes Olguin*, 2005 WL 67094, at *10 (finding grave risk where history of spousal abuse included beating respondent in attempt to cause abortion, kicking pregnant respondent in stomach, pushing her down stairs, and where expert testified "watching their mother being abused was as traumatic [to the children] as being abused themselves"); *but see Broca*, 2013 WL 867276, at *5 (finding no grave risk exception where child testified to three occasions of having been hit by petitioner, none requiring medical attention, and "no evidence that the children . . . suffer[ed] from any psychiatric infirmity brought about in part or in whole by Petitioner's behavior, or that upon return to [home country] same can be expected").

For example, in *Davies v. Davies*, 717 F. App'x 43 (2d Cir. 2017), the Second Circuit affirmed the district court's denial of a petition where ordering return would "expose [the child] to a grave risk of psychological harm" based in part on the petitioner's psychological abuse of respondent over many years and his "extreme violence and uncontrollable anger." *Davies*, 717 F. App'x at 48-49. The evidence in *Davies* of the

71

petitioner's pattern of physical and psychological abuse, and his propensity for violence, was overwhelming and disturbing. The Second Circuit recounted the ample record supporting the district court's finding of grave risk stemming from petitioner's "pervasive, manipulative" verbal abuse of the respondent all in the child's presence. The petitioner in *Davies*: smashed a glass door in anger, severely injuring himself in the process, and as he was bleeding profusely he simultaneously berated the respondent while toddler observed and cried; in a shaking rage, the petitioner screamed at both the respondent and the child and cornered them; splashed a glass of wine in the respondent's face; berated and towered over the respondent; ripped the child out of the respondent's arms; pushed the child out of the room to berate the mother; threw the child's toys and other objects in anger; screamed profanities at the child; and slammed on his car's brakes to teach the child a to wear a seatbelt. *Id.* at 47-48.

Before denying a petition under Article 13(b), the court is first required to make findings regarding the existence of "any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation." *Blondin II*, 189 F.3d at 248; *see also Saada*, 930 F.3d at 542 (remanding for

reconsideration where undertakings found unenforceable and
without sufficient guarantees of performance).  Respondent cites
to authority in the Sixth Circuit and First Circuit that assign
to *petitioner* the burden of establishing the "appropriateness
and efficacy of any proposed undertakings."  (Resp. Prop. 28
(citing *Simcox v. Simcox*, 511 F.3d 594, 611 (6th Cir. 2007) and
*Danaipour*, 286 F.3d at 21).)  The Second Circuit, however, has
yet to explicitly assign this burden to either party.  In
*Blondin IV*, however, the court described two situations giving
rise to a grave risk of harm, including "cases of serious abuse
. . . when the court in the country of habitual residence, for
whatever reason, may be incapable or unwilling to give the child
adequate protection."  *Blondin IV*, 238 F.3d at 162.  This
phrasing would imply that to prove grave risk, the respondent
must also prove the incapability or unwillingness of the home
country courts to protect a child from abuse.  In a more recent
decision, the Second Circuit held only that the district court
was required to make findings of such measures, without
assigning a burden of proof or production.  *Saada*, 930 F.3d at
542.  Logically, however, the burden would appear to fall to the
petitioner to establish ameliorative measures to defeat a grave
risk finding that would otherwise be fatal to the petition.  In
any event, neither party has established that ameliorative

measures by the courts in Ecuador would be ineffective or that the courts would be unwilling to adequately protect the child.

## 2. Application

The severity of the alleged physical and emotional abuse by petitioner against respondent and B.V. falls short of the nature and frequency of abuse discussed in *Davies*, *Blondin*, *Elyashiv*, and the several other reported cases in this Circuit. The Second Circuit has distinguished between abuse and sporadic or isolated incidents of physical discipline, which appears to be petitioner's view of his use of a belt to hit B.V. The evidence in the record, although disturbing, does not establish a "sustained pattern of physical abuse," nor does it demonstrate petitioner's "propensity for violent abuse," whether directed at the child or respondent. Indeed, even though the court credits most of the child's and Respondent's testimony as to the frequency and extent of petitioner's alleged physical and verbal abuse, which the court finds to be very concerning, respondent has not carried her burden by clear and convincing evidence to establish that the pervasiveness and severity of the abuse by petitioner rose to the level of abuse and harm found to be sufficient to deny return under the Second Circuit's standards.[19]

---

[19] Though the court heard testimony from Dr. Fernandez regarding the child's credibility, the court alone is empowered to make this determination. *Haimdas*, 720 F. Supp. 2d at 207 ("[T]he credibility and weight of testimony are questions to be decided exclusively by the [c]ourt.") Dr. Fernandez

There is no evidence in the record that B.V. has been diagnosed with post-traumatic stress disorder or that respondent sought police or medical assistance. Furthermore, though the court takes into account the child's unequivocal preference to remain with his mother rather than return to Ecuador, for largely the same reasons discussed above, B.V.'s preference is considered but not dispositive. Finally, as Dr. Fernandez found, though the child is stable, functioning well, secure and comfortable in the United States, the court finds that B.V. is not so settled that returning him to Ecuador would expose the child to a grave risk of harm based solely on the fact of return and the disruption of his life in New York.

Nor is the court convinced that Ecuadorian courts could not impose and enforce ameliorative measures to protect B.V. Although, there is no evidence in the record that respondent accused petitioner of hitting the child until after the filing of the instant petition, the court does not question the veracity of the testimony by respondent and B.V. regarding petitioner's abuse. *See In re D.T.J.*, 956 F. Supp. 2d at 548

---

opined that, based on his training and experience, his review of voluminous documents, and his interviews of B.V. and respondent, the child would be at grave risk of psychological harm and physical harm were he to be returned to Ecuador. (ECF No. 18, Fernandez Rept. 9.) As with credibility, this ultimate determination lies with the court. And the court has previously questioned "what a psychologist in a Hague Convention case could opine on," beyond mental or emotional pathology, "that is not already within the ken of an ordinary finder of fact." *Haimdas*, 720 F. Supp. 2d at 207.

(questioning veracity of sexual abuse claims never raised before petition was served on respondent); *see also In re Lozano*, 809 F. Supp. 2d at 224 (noting lack of physical abuse allegations which predated filing of petition).  Instead, the record demonstrates that Ecuadorian courts appear to have effective procedures and resources to meaningfully address allegations of child abuse.  During the 2015 Ecuadorian Family Court proceeding in which *petitioner* alleged respondent had hit B.V., respondent did not raise any of the present abuse allegations in that forum, despite her testimony in the instant proceeding that petitioner hit the child with a belt around the time that B.V. was three years old, or around 2013, that the child told her immediately after this happened, and that she saw the boy with two red marks on his buttocks.  Further, the September 2015 report detailing a therapy session with respondent and petitioner, indicates the father alleged abuse by the mother, and the mother alleged that the father verbally disparaged the child and disparaged respondent to the child, but did not allege or reference physical abuse of the child by petitioner.  (Ex. AM, Psych. Eval. 1.)  The Ecuadorian Family Court used psychologists to examine the child and assist the court; the court ultimately determined that respondent was innocent of abuse and that petitioner had attempted to influence the child against respondent.  (*See, e.g.*, Ex. AK, Aug. 20, 2015 Op. 4.)

The child's *in camera* testimony during the instant proceeding establishes at least one corroborated occasion where the father hit him with a belt. The court understands from the child's testimony, that petitioner struck him with a belt four separate times, as he testified to an additional time he was tied-up and hit by his father, though this was apparently a dream. *See Haimdas*, 720 F. Supp. 2d at 207 ("While the Court does not find that [the child] was intentionally untruthful, the only reasonable conclusion for the Court to draw is that some of [his] experiences as a young child are distorted and inflated in his memory."). B.V.'s initial testimony, that petitioner hit him four times with a belt and once with a stick, (Tr. 22-23), was subsequently muddied by the child's testimony that he was hit with a belt "[t]he third time, once." B.V. then clarified that his initial testimony on this subject that petitioner struck him four time with a belt by stating, "[a]ll of them, with all of those [times] that I mentioned," and when asked if it was correct that petitioner hit B.V. all four times with a belt, B.V. responded, "yes." (Tr. 25:5-25.) Moreover, respondent testified that she observed marks on B.V.'s buttocks after a visit with his father. (Tr. 204:18-19.) Petitioner further admitted hitting B.V. with a belt, but as observed by Dr. Fernandez, the court finds that petitioner attempted to qualify or minimize his acts by stating he hit B.V. with a cloth

belt from a girl's dress because he would not eat *choclo*, a corn dish. (Tr. 112:23-113:9.) The court credits B.V.'s testimony that petitioner struck him four times with a belt, though one instance appears to be a dream, and once with a stick. There is good reason to discount one of the instances of abuse as B.V.'s description of a vivid dream. Despite the child's fervent belief that he was not dreaming when his father tied him up with two belts and hit him while he was sleeping, the court finds that the description of the incident by B.V. appears to be a dream.

At most, however, and crediting the child's testimony entirely, which was occasionally inconsistent, petitioner hit B.V. with a belt four times and once with a stick. The mother testified, over a hearsay objection, to three instances of abuse by petitioner's ex-wife, though the child testified petitioner's ex-wife struck him only once with a stick, the same stick his father hit him with. The timing of the alleged abuse is also uncertain, as neither mother nor child testified to the child's age when he was hit by petitioner. Only petitioner testified that the child was either two or three when he hit the child with a belt for refusing to eat *choclo*. The other instances of abuse by petitioner that respondent and B.V. allege appear to have occurred at any time between 2013 and 2018, before the two

left Ecuador.[20]  This uncertainty as to time, and the lack of a precise recollection with the same details surrounding the one corroborated instance, coupled with respondent's abuse allegations that have not been raised before an Ecuadorian court, medical provider, or law enforcement, have been considered by the court.  Nonetheless, the court credits respondent's and B.V.'s allegations that petitioner struck B.V. four times with a belt and once with a stick, verbally abused B.V. and respondent, and physically struck respondent in the presence of B.V.

It is also worth noting that the child appears to use the verb "abusing" in a somewhat conclusory manner.  That is, while testifying about the loaded gun incident, the child stated his father threatened "maybe I might fire at you. So he was abusing me."  (Tr. 29:6-7.)  The court asked the child for clarification:

> The Court: How was he abusing you?
> A:  He was abusing me about giving me (sic) the gun.
> . . .
> The court: What happened? How did your father abuse you?
> A: He said that he might – he said that he was going to fire at me by accident. Let's see if he fired one shot at me.

---

[20]     Dr. Fernandez's Report, (ECF No. 18, Fernandez Rept.), which was not admitted into evidence, describes a single incident of physical abuse by petitioner in 2017, though this incident, involving petitioner allegedly tying up the child after he was at the beach with his half-brothers, was consistent with the child's testimony concerning a dream-like instance of abuse.

(Tr. 29-30.)  In this context, the child's use of the word
"abuse" indicates that petitioner's statement that "he was going
to fire" a loaded gun at B.V. "by accident" was reasonably
perceived as abuse by B.V.  As "abuse" is a word most children
have minimal occasion to hear or use, B.V.'s frequent use of the
word may be a result of the translation or his mother's use of
the word.  Moreover, the child likely would have heard the term
or its equivalent in 2015 surrounding petitioner's allegations
of abuse against respondent.  In any event, although the court
is not bound by any witness's characterization of an event as
abuse, whether a child, an adult, or an expert, the court
credits the child's testimony that petitioner struck him with
belts and a stick, and called him demeaning names, which
explains B.V's use of the word "abuse," and placed a loaded
firearm in B.V.'s hands which B.V. discharged.  The court notes
that B.V.'s school essay further supports B.V.'s testimony
regarding the abuse by petitioner and his family.  (Tr. 49-50.)

Turning next to petitioner's alleged physical and
psychological abuse toward respondent, these limited instances
do not rise to the level of physical or psychological abuse that
have supported denying a petition in previous cases within this
Circuit.  First, respondent testified that petitioner used force
on respondent, when petitioner pushed respondent out of his
warehouse in front of B.V, when she went to ask petitioner for

money to buy food and clothing for the child, who was three or
four years old.  (Tr. 176:17-25; 177:1-15); *See In re Filipczak*,
838 F. Supp. 2d 174, 180 (S.D.N.Y. 2011) (granting repatriation
petition even though the child had witnessed one incident of
spousal abuse as a two-year-old); *Rial v. Rijo*, No. 10-CV-1578,
2010 WL 1643995, at *2-3 (S.D.N.Y. Apr. 23, 2010) (ordering
return of child despite evidence that petitioner was verbally
and sometimes physically abusive to respondent).  In addition,
B.V. testified that he saw his father strike his mother with his
hands one time, which made B.V. feel "bad."  (Tr. 24-25.)
Second, respondent lived away from petitioner in Ecuador after
the child was about one year old.  There have been no
allegations of other physical abuse by petitioner against
respondent since about 2012.  *Cf. Davies*, 717 F. App'x at 49
(finding no ameliorative measures where the petitioner
"escalat[ed] his threats toward [the respondent] even after
their separation").  Moreover, although some of the emotional
and verbal abuse directed at respondent predates B.V.'s birth,
and the parties separated around the time B.V. was one year old,
respondent testified that B.V. repeated the same abusive
language directed at respondent by petitioner after B.V.
returned from visits with petitioner.  (Tr. 167:14-25, 168:1.)
B.V. testified that petitioner called him "queer," "fag," and
"shit," which made him feel badly and that petitioner hated him.

(Tr. 20-22.)  B.V. testified that his father sometimes directed

this language at others, sometimes at the child, and often when

he heard bad news of the child's performance in school.

Furthermore, according to respondent, petitioner referred to

B.V. as a "shitty" child when she went to drop off B.V. with

petitioner after he refused to allow her to travel with B.V.

Respondent also testified that, during an earlier visit with

B.V. to the United States in 2016, B.V. did not want to return

to Ecuador because he did not want petitioner to keep insulting

respondent and yelling at them.  (Tr. 213, 220.)

Thus, there is ample evidence that petitioner

routinely verbally abused respondent in the presence of the

child, and that the child had taken to repeating some of these

insults.  The court in no way condones or minimizes the verbal

and emotional abuse respondent claims to have experienced during

her encounters with petitioner, and even after leaving his home.

Crediting all her testimony, however, convinces the court only

that respondent suffered occasional verbal and emotional abuse,

and one incident of physical abuse that did not require any

medical treatment, in the presence of the child, all which do

not rise to the level of physical or psychological abuse against

a parent as that presented in *Davies*.  717 F. App'x at 47-49.

Respondent established through the testimony of Dr. Fernandez

that the child's exposure to and resulting use of insulting and

abusive language demonstrated that B.V. has been psychologically affected by petitioner's verbal abuse and insults.

Respondent next supports her Article 13(b) defense by testifying that B.V. told her that petitioner left the child with his daughter, Pocha, and his ex-wife who would in turn leave the child alone, including overnight, and physically hurt B.V. (Tr. 201.) It is undisputed that the child had a serious fear of being left alone, as the father testified. Dr. Fernandez further explained that this type of fear is due to the child not having a secure attachment to petitioner. (Tr. 317-18.) Respondent presented evidence of a text message from B.V. to his sister Pocha demonstrating that she had left the child alone sometime in October 2017 around 10 a.m. The child also testified to being left alone by Pocha once, but did not specify that it was overnight. Petitioner denied he or Pocha would ever leave the child alone, day or night, especially given that petitioner and his daughter live close together and she could have brought B.V. back to petitioner's home. Petitioner, however, left B.V. in the care of his daughter, Pocha, if he stayed in Guayaquil where his business was located. (Tr. 201:6-10.) Respondent testified, over petitioner's objection, that B.V. told her Pocha left him alone at night on four occasions, and that the child would "get up in the middle of the night looking around the house" and find no one there, including

Pocha's children.  (Tr. 205-06.)  When respondent called
petitioner about the situation, petitioner did not deny he had
left B.V. in Pasaje and had returned to Guayaquil, and told her
not to get involved and that he had to return to Guayaquil to
work, so left B.V. in Pasaje.  (Tr. 201.)

        The father's testimony is clearly contradicted, and
respondent and B.V.'s testimony supported by the texts between
B.V. and Pocha.  Respondent's testimony regarding what B.V. told
her is hearsay and cannot be considered for the truth.  On the
other hand, when respondent called petitioner to express her
objection to having B.V. with Pocha, he did not deny that he had
done so, and instead told respondent it was not her problem and
that he was very busy and did not want respondent to call him.
(Tr. 208.)  Moreover, the child's testimony that he was left
alone once, (Tr. 26:12), is corroborated by the morning text
messages.  Thus, although the preponderance of the credible
evidence does not establish that the child was left alone by
Pocha overnight, this court finds respondent's testimony
credible that she was concerned by her son's accounts of being
left alone by Pocha and Cuenca, and called petitioner multiple
times with her concerns, but was told by petitioner that he was
busy and his actions were not her concern.  Certainly, it was
neglectful and irresponsible for Pocha to leave B.V. alone,
though the court cannot conclude her behavior constitutes a

pattern of abuse or neglect by petitioner for leaving B.V. in her care. Given B.V.'s fear of being left alone, however, he is at risk of further psychological harm to B.V. should he be repatriated and left alone.

Respondent also argues, and the court agrees, that the child's access to guns, including being handed a loaded firearm by his father, supports a finding of grave risk in this case. Though the father is in the licit trade of firearms, the presence of guns within petitioner's vehicle and home is at least concerning to the court and certainly militates in favor of finding grave risk of harm to the child. There is credible evidence that petitioner transported weapons hidden in his vehicle while also transporting B.V., that he one time sold or gave a gun to someone at his home while the child was nearby, and that he occasionally used the child as some form of "cover" while transporting weapons in his vehicle. Moreover, there is credible evidence that B.V. had unsupervised access to guns within petitioner's home, and that petitioner handed B.V. a loaded gun that B.V. accidently fired and damaged petitioner's computer. Of particular concern is B.V.'s testimony that after petitioner handed a loaded weapon to him, B.V. described as "abuse" petitioner's statement that "he was going to fire at [B.V.] by accident," that B.V. was scared, and that B.V. then fired the weapon which damaged his father's computer. (Tr. 27-

31.)  The child's testimony as to this incident and his sense of fear was credible and petitioner's denial, his testimony regarding a toy gun, and his inability to explain what happened to his computer when respondent called him about the incident were not credible.  Although the child had an apparent affinity for video games that involve firearms, his testimony regarding observing firearms in specific locations within petitioner's home was credible and corroborated by respondent's observations regarding the presence and locations of firearms when she lived with petitioner.  (*See, e.g.*, Tr. 34:15 ("Q. How did you know what [the silencer] was? A. In a game Fortnite.").)

For his part, petitioner denied keeping loaded weapons in his home, denied that he transported weapons in his vehicle-he instead testified a gun found under the seat by police was his grandson's toy gun—and clarified that leaving a child with a weapon would be irresponsible, though not, in his view, abuse.  He also denied the child fired an actual firearm, and instead fired a toy gun.  The court does not find petitioner's foregoing testimony credible.  Respondent testified that B.V. had no toy guns and that petitioner did not keep toy guns at his office, though it was unclear when she had last been to petitioner's office.  B.V. also denied that the weapons that petitioner concealed in his truck and the weapon B.V. fired at petitioner's warehouse were toy guns.

Courts in this Circuit have dealt with Hague Convention cases that have involved firearms and, as in the instant case, have also included allegations of threats with the gun to the respondent or child. *See Rodriguez v. Rodriguez*, 33 F. Supp. 2d 456, 459-60 (D. Md. 1999) (finding grave risk where father beat, punched, and kicked children, further threatened to kill children, and kept a loaded gun); *Elyashiv*, 353 F. Supp. 2d at 398-400 (finding grave risk where father threatened to kill his children and wife with weapons he kept in the house, including a loaded handgun and three swords). Petitioner's statement that he "maybe" will fire at the boy or that he "was going to fire at [B.V.] by accident" was perceived by B.V. as a threat, causing B.V. to feel scared, and pull the trigger of a loaded weapon, discharging a bullet. This statement by petitioner, coupled with the act of placing a loaded weapon in B.V.'s hands, rises to the level of the threats and grave risk of harm in other cases which were coupled with sustained patterns of physical abuse.

### i. *Child's Wishes*

As discussed above, the court may appropriately consider the child's wishes in determining whether repatriation poses a grave risk to the child. *Blondin IV*, 238 F.3d at 166 ("[A] court may consider a younger child's testimony as part of a broader analysis under Article 13(b)."). In *Blondin IV*, the

Second Circuit clarified that "if a child's testimony is germane to the question of whether a grave risk of harm exists upon repatriation, a court may take it into account." *Id.* As the court did in its analysis of respondent's Article 13 defense, the court finds that B.V. is sufficiently mature to render credible testimony regarding his reasons for his strongly stated aversion to being returned to Ecuador. Yet, B.V.'s objection cannot, in and of itself, form the sole basis for denying the petition. Even still, the child's objection alone does not indicate that a grave risk of harm exists if he were to be repatriated. The child credibly described fear of his father and his family, based on physical and emotional abuse. His credible testimony established that B.V. experienced abuse or neglect at the hands of petitioner and his family, however not sustained to the degree required by Second Circuit cases, such that returning the child to Ecuador would put him in an intolerable situation. That a return to Ecuador does not comport with the child's preference is one of the situations that the Second Circuit explained does not, by itself, pose a grave risk of harm. *Blondin II*, 238 F.3d at 162.

### ii. Well-Settled Exception

Finally, petitioner argues that B.V. is well-settled in his new environment such that returning him would expose him to a grave risk of harm. Article 12 of the Convention grants

the court authority to deny a petition, filed more than one-year from the child's alleged wrongful removal, if the respondent establishes by a preponderance of the evidence, 22 U.S.C. 9003(e)(2)(B), that "the child is now settled in [his] new environment," Hague Convention, art. 12. The question of whether B.V. is settled is presented to this court not under Article 12, however, as the one-year period had not expired at the time petitioner commenced this action. *Id.* In any event, pursuant to *Blondin IV*, the court may consider whether a child is settled when considering the Article 13(b) defense and whether repatriation would so disrupt the child's well-settled life in the United States so as to contribute to a grave risk of harm. *See Blondin IV*, 238 F.3d at 164-65 ("Under Article 13(b), the fact that a child is settled may form part of a broader analysis of whether repatriation will create a grave risk of harm.").

Thus, respondent may support a meritorious Article 13(b) defense by arguing the child is well-settled and that the act of repatriation would contribute to a grave risk as long as this factor is not the *sole* basis of a finding of grave risk. Dr. Fernandez testified that the return of B.V. to Ecuador would present a grave and imminent risk of harm to B.V., based upon his review of voluminous documents, testimony by petitioner and B.V., and his evaluation of B.V. and respondent. Further,

B.V.'s well-being, sense of safety and stability, and physical

distance from physical and emotional abuse by petitioner would

be diminished if B.V. is returned to Ecuador.  This court,

however, acknowledges, as the Second Circuit has cautioned, that

the mere act of repatriation is an unsettling and inevitable

consequence of removal but, by itself, does not constitute a

grave risk of harm.  *Blondin IV*, 238 F.3d at 165.

Though courts may consider whether a child is settled

as part of its Article 13(b) determination, the cases in which

the Second Circuit approved consideration of this factor

involved unique threats to the child.  In *Blondin III*, the

district court found, and the Second Circuit approved this

finding in *Blondin IV*, that wresting the children from their

"safe, extended-family environment," where the children had

"begun to recover from the trauma caused by their father's

abuse," would cause a recurrence of their traumatic stress

disorder.  *Blondin III*, 78 F. Supp. 2d at 295, *aff'd*, *Blondin

IV*, 238 F.3d at 165.  That is, the children had been diagnosed

with PTSD and the mere act of repatriation would, by itself,

unavoidably trigger further harm.  Thus, the Second Circuit

found it was not error for the district court to consider

whether the children had become deeply rooted in the United

States when considering respondent's Article 13(b) claim.

*Blondin IV*, 238 F.3d at 165.

In considering whether a child is settled, courts weigh a variety of factors. Generally, to be "settled" means that the child has "significant emotional and physical connections" to his new environment that demonstrate "security, stability, and permanence." *Lozano*, 697 F.3d at 56. Factors that shed light on the child's connections and stability include: the child's age; the stability of the child's residence in the new environment; the child's consistent school attendance; the child's regular participation in religious, community, or other extracurricular school activities; the respondent's employment and financial stability; the proximity of the child's friends and extended family; and the child's and respondent's immigration status. *Id*. (adopting "fact-specific multi-factor test").

Respondent argues that practically all of these factors weigh in favor of finding B.V. settled, and cites to evidence of the child's regular attendance at school and church; the loving and stable environment in child's residence in Queens, New York, with his mother, great aunt, and cousins, and respondent's regular employment and financial stability. (Resp. Prop. 28-29.) As for respondent and child's immigration status, respondent argues this is not a singularly dispositive factor within this Circuit and has presented undisputed evidence that

child and mother are not at a high risk of deportation. (*Id.* at 29.)

Petitioner argues that the child's status as settled is not relevant to the court's grave risk determination because, although a court may consider evidence of settlement, natural disruptions flow from an international move that do "not by themselves constitute such a [grave] risk." (Pet. Prop. 34 (citing *Blondin IV*, 238 F.3d at 164-65).) This case, petitioner argues, is not so exceptional that an order granting the petition would pose a grave risk by disrupting the child's settled status. Petitioner also argues that respondent's and B.V.'s lack of immigration status is inherently destabilizing, even if their removal is not imminent. (*Id.* at 35.)

*First*, the Second Circuit has squarely held that lack of legal immigration status does not preclude a court from finding that the "settled" defense has been established. *See Lozano*, 697 F.3d at 56 ("[I]mmigration status should only be one of many factors courts take into account when deciding if a child is settled within the meaning of Article 12 . . . . [I]n any given case, the weight to be ascribed to a child's immigration status will necessarily vary."); *see also Broca v. Giron*, 530 F. App'x 46, 47 (2d Cir. 2013) (noting no single factor, "including immigration status, is dispositive"). The court heard testimony from an immigration attorney on

respondent's and child's immigration status and outlook, and
notes this factor is not at all dispositive.  Though the mother
and child's respective status in this country is potentially
destabilizing, the prospects of removal are remote, the process
is sure to be drawn-out, and respondent and child have
potentially meritorious claims for relief.  Moreover, petitioner
failed to demonstrate that either respondent or child face a
high risk for deportation.

Considering the other germane factors, it is
undeniable the child has a support network and ties to his
family, school, and religious community in the United States.
He attends school and appears to enjoy it, whether or not he
will repeat the third grade.  He testified in English at times.
He also attends church and has family here.  It does not appear
that the child is isolated.  And, as discussed above, B.V. has a
solid, safe, and strong relationship with respondent and appears
to enjoy his life in the United States.  Although these findings
establish that B.V. is well-settled, they do not necessarily
indicate that B.V.'s return to Ecuador would constitute grave
risk of harm to B.V.  *In re R.V.B.*, 29 F. Supp. 3d at 258
("[T]he Child's opinion that she likes it in America 'much much
better' does not indicate that grave risk of harm exists if she
returns.").

The court agrees with petitioner that this case does not present the exceptional circumstances present in the *Blondin* cases that permitted the district court to consider the child's settled status under Article 13(b).  Indeed, the district court in *Blondin III* did not consider the typical "well-settled" factors under Article 12, those argued by respondent here, but instead focused on the children's recovery from PTSD in their safe and secure emotional relationship base that was nurtured in the United States.  *Blondin III*, 78 F. Supp. 2d at 295.  There is no evidence in the record that B.V. suffers from PTSD or any other psychological infirmity that would make the child more susceptible to harm caused by repatriation based on his settled status.  Thus, it appears that respondent's reliance on *Blondin IV* to argue the child is settled is misplaced.

Given the foregoing, the court finds that respondent has established by clear and convincing evidence that there is a grave risk the child would be exposed to physical or psychological harm were he ordered returned, although the court finds that, respondent has shown sporadic, rather than sustained instances of physical and emotional abuse by petitioner of respondent or B.V.  Petitioner's failure to secure firearms in his home, and the placing of a loaded weapon in B.V.'s hands, in the court's view, present an imminent and grave risk of harm to the child, as demonstrated by B.V.'s accidental firing of the

weapon and resulting damage to the petitioner's computer.
Though petitioner's alleged demeaning conduct to the mother and
child are unacceptable, it does not amount to a grave risk of
harm in light of the case law in this Circuit.

### iii.  Ameliorative Measures

Before the court may deny a petition on the grounds
that repatriation poses a grave risk to the child, the court
must first "examine the full range of options that might make
possible the safe return of a child to the home country."
*Blondin IV*, 238 F.3d at 163 n.11.  Included in the court's
analysis is whether "the court in the country of habitual
residence, for whatever reason, may be incapable or unwilling to
give the child adequate protection."  *Souratgar*, 720 F.3d at 103
(citing *Blondin IV*, 238 F.3d at 162).  The court must "take into
account any ameliorative measures (by the parents and by the
authorities of the state having jurisdiction over the question
of custody) that can reduce whatever risk might otherwise be
associated with a child's repatriation."  *Saada*, 930 F.3d at 539
(quoting *Blondin II*, 189 F.3d at 248).  Though a petitioner may
agree to certain ameliorative measures, the court's
determination must focus on what measures are *enforceable*.  *See*
*Saada*, 930 F.3d at 542; *see also Elyashiv*, 353 F. Supp. 2d at
409 (denying petition in part due to petitioner's likelihood of
disobeying protective order in home country); *Davies*, 717 F.

App'x at 49 (affirming denial of petition where petitioner manipulated legal system of home country and stated "there was no amount of money that he would take to exact his revenge on [the respondent]").

While the burden of production remains unclear on this issue, both parties have argued this point. Petitioner argues that the parties are serial litigants in Ecuador's family courts and that those courts are "well equipped to handle the parties' current dispute" including making credibility determinations. (Pet. Prop. 36.) Moreover, petitioner argues, respondent admitted she would be willing to fight for custody of B.V. in the courts of Ecuador, and did not testify to the Ecuadorian court's failures to protect the child or fairly resolve the parties' previous custodial and support disputes. Respondent argues that no ameliorative measures could protect the child because she does not intend to return to Ecuador and petitioner is unlikely to comply with any ameliorative measure. Moreover, as respondent testified, petitioner has threatened her with bodily harm including death, that she will have to pay, and with jail.

Respondent testified that, even if the child were ordered returned by the court, she would not return to Ecuador. (Tr. 221:1-10.) She fears, based on petitioner's threats of jail, being put in jail by petitioner for her wrongful

retention, or worse, that he will have her killed, as he has previously threatened that he would send a Colombian assassin to make her disappear. (Tr. 231:8-233:24.) Though she conceded her home in Ecuador was a safe place for the child, petitioner threatened that he would take her home away, (Tr. 232:10-14), and she believed she could not protect B.V. "from behind bars or from the grave." (Resp. Prop. ¶ 138.) She bases this fear on petitioner's prior efforts to have respondent jailed, his ownership of a gun shop, and his "willingness to manipulate the legal system and lie under oath." (Resp. Prop. 29.) Respondent argues that no ameliorative measures would be effective given petitioner's refusal to admit, and his attempts to minimize, his past abuses, let alone recognize the same. (*Id.* at 26; Resp. Prop. ¶ 143.) Moreover, Dr. Fernandez noted that petitioner's denials and minimizing of abuse presented an ongoing risk. (Tr. 311.) Thus, according to respondent, petitioner has provided no evidence that he has taken steps to address his own abusive behaviors and, instead, and is likely to resume his abusive behavior if given sole custody of B.V. (Resp. Prop. 29.)

Petitioner argues that respondent's potential loss of custody is not something for this court to consider in determining grave risk to the child because it is simply a consequence of choices made by respondent. (Pet. Prop. 23 (citing *In re Koc*, 181 F. Supp. 2d 136, 156 (E.D.N.Y. 2001)).)

Moreover, petitioner argues, respondent has not proven by clear and convincing evidence that she will lose custody, relying only on her subjective belief that petitioner intends to put respondent in jail. (*Id.* at 24-25.) Petitioner cites to the fact that in an alleged phone call between respondent and petitioner in May 2018, he did not tell her that he was seeking any criminal enforcement or an order to have her put in jail. (*Id.* at 25 (citing Tr. 233:7-9).) Moreover, he argues, during the 2015 child abuse proceedings between the parties, petitioner only sought psychological treatment for respondent and did not seek to have her punished. (*Id.* (citing Ex. AL, H'rg Record).) Finally, petitioner points out that respondent's refusal to return, even if he agreed not to press charges against her in Ecuador, undermines her fear.

The court has previously decided a Hague Convention case in which the respondent refused to live with the petitioner if the child were ordered returned. *See In re Koc*, 181 F. Supp. 2d at 143. The respondent mother argued in support of an Article 13(b) defense that the child would thus be "denied 'the benefit of motherly love.'" *Id.* at 156. The court, however, found this possibility to be "a consequence of choices made by respondent" and not one the court could consider in determining whether repatriation posed a grave risk. *Id.*

It would defy the policy undergirding the Convention if a respondent could avoid a custody dispute in the state of habitual residence by refusing to return, and thus prevail by default by defeating a petition for return. Absent a showing of grave risk, or any of the other statutory exceptions, courts are obligated to return a child so that the better-situated home country courts can determine the custody dispute. Even in the face of grave risk, where an ameliorative measure would include court-ordered custodial arrangements to protect the child, a respondent should not be rewarded for declining to ameliorate the risk by refusing to return with a child to the habitual residence, and thus, risk losing custody.

In the several cases in this Circuit where courts found no ameliorative measure suitable, as discussed above, the grave risk was due, in part, to the triggering of a child's PTSD by the act of repatriation itself. *See Blondin III*, 78 F. Supp. 2d at 297; *Reyes Olguin*, 2005 WL 67094, at *11; *see also In re D.T.J.*, 956 F. Supp. 2d at 548 (finding no ameliorative measures existed where "the return to Hungary itself and proximity to [petitioner] himself present a grave psychological risk to [child]"). In *Reyes Olguin*, for example, the court found no ameliorative measures available where an expert report indicated the child's hometown did "not have sufficient social services for victims of domestic violence, but also that violence towards

women and children is culturally accepted to a degree." *Reyes Olguin*, 2005 WL 67094, at *10. The *Reyes Olguin* court noted that the respondent had put forth substantial evidence as to the lack of sufficient ameliorative measures, including an expert's testimony that the child's state of habitual residence "lack[ed] structure for the child[]" to receive necessary treatment for his diagnosed PTSD. *Id.* at *3-4, *11.

There is evidence in the record before the court, including Dr. Fernandez's review of documents and his evaluation of B.V., that B.V. would be at grave and imminent risk if returned to Ecuador. Moreover, attorney Gould testified that in her limited experience, Ecuador had a "general problem . . . with domestic violence" and that the Ecuadorian government failed to take action to protect victims. (Tr. 61:4-11.) Attorney Gould, however, not only conceded that her experience with Ecuador as an immigration attorney was limited, she presented no supporting evidence for her statement, and the court did not qualify her as an expert witness in general, or specifically on the topic of domestic abuse in Ecuador or the judicial and social services resources in Ecuador. Dr. Fernandez also testified generally to underreporting of spousal abuse by Hispanic women "due to [Hispanic] culture being a patriarchal culture." (Tr. 309:16-20.) Though Dr. Fernandez is the son of native-born Hispanic parents, (Tr. 270:15-17), and

his practice involves "predominantly Latinos [and] Hispanic immigrants," (Tr. 274:11-14), he was not qualified as an expert in Hispanic culture, or Ecuadorian culture or Ecuadorian child abuse law specifically. Moreover, he was not qualified as an expert in the types and efficacy of social services available in Ecuador for domestic abuse victims. On this evidence, the court cannot make a determination, one way or the other, about the availability of ameliorative measures of the kind discussed by experts in *Reyes Olguin*.

Other than the foregoing testimony regarding Ecuadorian domestic issues, there is no evidence that respondent sought assistance or protection from Ecuador's courts or police and was denied. The evidence established that respondent has legal counsel, won child support payments from petitioner, withstood his attempt to reduce those payments, successfully defended against petitioner's abuse complaint, and twice obtained court orders granting her authority to travel with B.V. to the United States. Furthermore, there is no evidence that petitioner disobeyed these orders or has shown a propensity to manipulate Ecuador's legal system as opposed to exercising his custodial rights.[21] Respondent has not established that

---

[21] Although, there is some evidence that respondent failed to appear for one joint therapy session with petitioner, (Ex. AM, Psych. Eval), the visitor's logs in evidence demonstrate that respondent and B.V. attended therapy, on specific dates, and that petitioner did not, however, the

petitioner's allegations of her abuse of B.V., though proven false by Ecuador's courts, was a baseless attempt to put her in jail, instead of a reaction to her request for child support. Even though the court finds that repatriation would pose a grave risk, there is no evidence that B.V. suffers from PTSD and is susceptible to relapse if he were returned to Ecuador.

It is undisputed that the parties have both been active litigants in the Ecuadorian court system, both bringing claims for relief in their custodial and support dispute. Respondent testified that she has an attorney who filed documents with the Ecuadorian court when petitioner first sought relief for B.V.'s wrongful retention. There is no allegation that respondent sought and was denied the assistance of police or the courts for petitioner's physical abuse of either herself or B.V. Finally, though petitioner appears to still insult and berate respondent, the two do not live together and can largely avoid each other given their custodial arrangement before respondent traveled to the United States. Though petitioner's alleged behavior is repugnant, the court is not in the business of enforcing civility between parents in Hague Convention cases. Moreover, the Ecuadorian Family Court system appears to have

---

evidence does not establish that petitioner was ordered to attend therapy during that time period, (Ex. AB, Visitor Log; Ex. AI, Soc. Worker Rept.).

provided for family therapy, even if the parties' attendance was disputed or sporadic.

Based on the record before it, the court cannot conclude that the Ecuador courts are "incapable or unwilling to give the child adequate protection." *Souratgar*, 720 F.3d at 103. Thus, the court concludes that although respondent carried her burden of proving grave risk by clear and convincing evidence, there are sufficient remedies available in the child's country of habitual residence to ameliorate the harm alleged by respondent. "'[T]he exercise of comity that is at the heart of the Convention' requires [the court] 'to place [its] trust in the courts'" of Ecuador to resolve the custody dispute between the parties and issue whatever orders necessary to safeguard the child. *Saada*, 930 F.3d at 539-40 (quoting *Blondin II*, 189 F.3d at 249). Given the proven capability of the courts of Ecuador to resolve and address allegations of abuse and the custody and support dispute between petitioner and respondent, the court finds it need not order undertakings by the parties to ensure the child's safety. *Id.* at 541, n.33 ("In most cases, the international comity norms underlying the Hague Convention require courts . . . to assume that an order by a foreign court imposing protective measures will guarantee performance of those measures.").

**CONCLUSION**

Based on the foregoing, the court finds that B.V. must be returned to Ecuador under the Hague Convention because respondent has failed to establish the applicability of any asserted exception. Though the court is sympathetic to any disruption the return to Ecuador will have on respondent's and the child's lives, the court must nevertheless faithfully adhere to the mandates of the Hague Convention. The parties shall resolve any custodial disputes they may have in the courts of Ecuador.

The petition is hereby GRANTED and the child shall be returned to Ecuador. The Clerk of Court is ordered to enter judgment in favor of petitioner, return the child's passport to petitioner's attorneys, Robert Pees, Esq. and Saurabh Sharad, Esq., to be given to the child's designated chaperone so that the child may return to Ecuador. The parties are to meet and confer regarding the return of B.V. to Ecuador and any ameliorative measures, enforceable by the courts in Ecuador, to protect B.V. from harm pending the Ecuadorian court's custody

determination.  This Order is stayed for thirty days to allow

the parties time to resolve the method of B.V.'s return, and for

respondent to seek and obtain a decision on an expedited appeal.

**SO ORDERED.**

Dated:     Brooklyn, New York
           October 15, 2019

                                    _____/s/_____
                                    **Kiyo A. Matsumoto**
                                    United States District Judge